ESTATE of Elvis PRESLEY, Plaintiff,

v.

Rob RUSSEN, d/b/a The Big El
Show, Defendant.

Civ. A. No. 80–0951.

United States District Court,
D. New Jersey.

April 16, 1981.

David Gutin, Camden, N. J., W. M. Webner, Littlepage & Webner, Arlington, Va., D. Bleecher Smith, II, Glankler, Brown, Gilliland, Chase, Robinson & Raines, Memphis, Tenn., Alan M. Lerner, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for plaintiff.

James Greenberg, Camden, N. J., Dennis H. Eisman, Philadelphia, Pa., for defendant.

## ON MOTION FOR A PRELIMINARY INJUNCTION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge.

During his lifetime, Elvis Presley established himself as one of the legends in the entertainment business. On August 16, 1977, Elvis Presley died, but his legend and worldwide popularity have survived. As Presley's popularity has subsisted and even grown, so has the capacity for generating financial rewards and legal disputes.[1] Although the present case is another in this line, it presents questions not previously addressed. As a general proposition, this case is concerned with the rights and limitations of one who promotes and presents a theatrical production designed to imitate or simulate a stage performance of Elvis Presley.

This action is currently before the court on a motion by plaintiff, the Estate of Elvis Presley, for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. It seeks a preliminary injunction restraining defendant, Rob Russen, d/b/a THE BIG EL SHOW (hereafter Russen), or anyone acting or purporting to act in his or its behalf or in collaboration with it from using the name and service mark THE BIG EL SHOW and design, the image or likeness or persona of Elvis Presley or any equivalent, the names Elvis, Elvis Presley, Elvis in Concert, The King, and TCB or any equivalent or similar names on any goods, in any promotional materials, in any advertising or in connection with the offering or rendering of any musical services.

Plaintiff instituted suit on April 9, 1980 for federal law unfair competition (false designation of origin under § 43(a) of the Lanham Trademark Act, 15 U.S.C.

§ 1125(a)), common law unfair competition, common law trademark infringement, and infringement of the right of publicity. This court has jurisdiction by virtue of 15 U.S.C. § 1121, 28 U.S.C. § 1332, and 28 U.S.C. § 1338. Venue is properly laid in the District of New Jersey by 28 U.S.C. § 1391. Plaintiff seeks a permanent injunction, an impounding and delivery to plaintiff of promotional and advertising materials, letterheads, business cards and other materials, an accounting of defendant's profits, and an award of treble damages and reasonable attorneys' fees. Defendant answered the allegations contained in the complaint and also filed a counterclaim alleging that the plaintiff's actions were in violation of the anti-trust laws of the United States.

On October 2, 1980, the court conducted a hearing on the preliminary injunction motion, which is being submitted upon the proof taken at the hearing, pleadings, depositions, affidavits, exhibits, and written briefs. This opinion incorporates the court's findings of fact and conclusions of law as authorized by Rule 52(a) of the Federal Rules of Civil Procedure.

Every Finding of Fact that may be a Conclusion of Law is adopted as such; and every Conclusion of Law that may be a Finding of Fact is adopted as such.

## FINDINGS OF FACT

*Plaintiff*

1. Plaintiff is the Estate of Elvis Presley (hereafter the Estate) located in Memphis, Tennessee, created by the Will of Elvis Presley and is, under the laws of the State of Tennessee, a legal entity with the power to sue and be sued. (Tennessee Code Annotated § 35–618; Exhibit P 26).

2. The Estate came into being upon the death of Elvis Presley on August 16, 1977. (Parker, Affidavit).

1. *See Memphis Development Foundation v. Factors Etc., Inc.,* 616 F.2d 956 (6th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980); *Factors Etc., Inc. v. Pro Arts, Inc.,* 496 F.Supp. 1090 (S.D.N.Y.1980) (permanent injunction); 444 F.Supp. 288 (S.D.N.Y.1977)

(preliminary injunction) *affirmed,* 579 F.2d 215 (2nd Cir. 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279, 282 (S.D.N.Y.1977).

3. During his career, Elvis Presley established himself as one of the premier musical talents and entertainers in the United States, Europe and other areas of the world. He was the major force behind the American Rock and Roll movement, and his influence and popularity has continued to this day. During Presley's legendary career, his talents were showcased in many ways. He performed in concert, setting attendance records and selling out houses in Las Vegas and other cities in which his tour appeared. He starred in numerous motion pictures including one entitled Viva Las Vegas, which is also the name of the movie's title song which Presley sang. He made records which sold over one million copies and appeared on·television programs and in television specials made from his tour programs. (Jarvis Testimony, Tr. pp. 42–63).

4. The Elvis Presley tours were billed as "Elvis in Concert," and his nightclub performances were billed as the Elvis Presley Show, while Elvis Presley shows in Las Vegas were billed simply as "Elvis." Most of Elvis Presley's record albums used the name ELVIS on the cover as part of the title. One of his albums was entitled ELVIS IN CONCERT. (Hanks, Affidavit; Jarvis Testimony, Tr. pp. 45, 49, 63; Exhibits, P 10, 12, 16).

5. Elvis Presley adopted the initials TCB along with a lightning bolt design to identify entertainment services provided by him. This insignia appeared on letterheads, jackets for personnel associated with the show, a ring worn by Presley while performing, and tails of Presley's airplanes. Also, Presley's band was identified as the TCB band. (Jarvis Testimony, Tr. pp. 45–46, 53–57; Exhibits, P 17A, 17B).

6. Elvis Presley's nickname was "THE KING." (Jarvis Testimony, Tr. p. 57).

7. Although Elvis Presley exhibited a range of talents and degrees of change in his personality and physical make-up during his professional career, he, in association with his personal manager, Thomas A. (Col.) Parker, developed a certain, characteristic performing style, particularly as to his live stage shows. His voice, delivery, mannerisms (such as his hips and legs gyrations), appearance and dress (especially a certain type of jumpsuit and a ring), and actions accompanying a performance (such as handing out scarves to the audience), all contributed to this Elvis Presley style of performance. (Jarvis Testimony, Tr. pp. 45–53; Exhibits P 10, 12, 16).

8. One particular image or picture of Presley became closely associated with and identifiable of the entertainment provided by Elvis Presley. This image (hereafter referred to as the "Elvis pose") consisted of a picture or representation of Elvis Presley dressed in one of his characteristic jumpsuits with a microphone in his hand and apparently singing. (Exhibits P 10, 12, 16).

9. Elvis Presley exploited his name, likeness, and various images during his lifetime through records, photographs, posters, merchandise, movies, and personal appearances. (Exhibits P 1, 12, 13, 16, 20, 21, 27; Jarvis Testimony, Tr. pp. 44–64).

10. As a result of Presley's own talent, as well as of the various promotional efforts undertaken on his behalf, the popularity of Elvis Presley and his entertainment services, as identified by certain trademark and service marks, reached worldwide proportions. Elvis Presley productions achieved a reputation for a certain level of quality and performance. Goodwill attached to Presley's performances and the merchandise bearing his name and picture.

11. From nearly the beginning of his life as an entertainer, Elvis Presley was represented in his career by Thomas A. (Col.) Parker. (Exhibit P 25; Parker Affidavit).

12. On March 26, 1956, Elvis Presley having reached age 21 entered into an agreement with Col. Parker, amending an agreement entered into in 1955 between Col. Parker and Elvis Presley and his parents, making Parker Elvis Presley's "sole and exclusive Advisor, Personal Representative and Manager in any and all fields of public and private entertainment." (Exhibit P 25).

13. Throughout Presley's professional career, Parker continued to supervise and authorize the commercialization of Presley's name, image, picture, and/or likeness. He granted different entities the right to use Elvis' name, image, picture or likeness on such merchandise as posters, statues, and buttons, for a limited time in return for a percentage on the sales of the articles involved. (Parker Affidavit). On July 26, 1956, Col. Parker, with Presley's approval, entered into an agreement with Special Projects, Inc. granting to it for a term of one (1) year a commercial license for the use of the name, photograph and likeness of Elvis Presley "in connection with the sale, marketing and exploitation of consumer items." (Exhibit P 27).

14. The working relationship between Presley and Parker begun in 1955 appears to have continued throughout Presley's career. Although there are some gaps in the documents showing this relationship during the next 22 years, the evidence presented sufficiently supports their continuing association. (Parker Affidavit; Davis Affidavit).

15. In particular, on January 22, 1976, Elvis Presley entered into an agreement (Exhibit P 1) with Col. Parker, d/b/a All Star Shows, whereby he authorized Parker to set up tours, promotion, merchandising sales and any other medium involving the artistry of Elvis Presley and to generally act as his agent for merchandising projects, personal appearances, motion picture performances, and "any other projects involving the personal services, name, photo or any likeness of the Artist," Elvis Presley. The agreement also sets forth the responsibilities of Presley and Parker with respect to the shows. "Presley is responsible for the presentation of the stage performance" and Col. Parker handles the "advertising and promotion of the show." Thus, Presley did not authorize any rights associated directly with the performances and how they were to be conducted.

This agreement which recognizes Presley's existing contracts did not preclude Elvis Presley from arranging any activities, including merchandising or performing, on his own behalf. The terms of the agreement appear to negate any implication of an "assignment," which would necessarily preclude Elvis Presley himself from entering into agreements pertaining to the use of his name, likeness and image. The agreement, which was limited to a seven (7) year period, gave Parker supervision of merchandising projects and a power of attorney-infact for specified purposes, but did not assign or sell the rights of Elvis Presley to his name, likeness or image.

16. In 1974, Boxcar Enterprises, Inc. was incorporated. Col. Parker and Elvis Presley were two of the original subscribers to the stock in the corporation. According to the charter of the corporation, it was formed for the purpose of, *inter alia*, publishing music, managing entertainers, producing records, producing motion pictures, producing entertainment, selling merchandise and otherwise generally engaging in the broad range of activities corporations may undertake. Col. Parker, Elvis Presley, and Tom Diskin, the President of Boxcar, did subscribe to shares in the corporation, for which shares Elvis Presley gave a consideration of three thousand dollars ($3,000.00). (Hanks Affidavit and Exhibits; Diskin Affidavit).

17. Col. Parker is the majority shareholder in and Chairman of the Board of Boxcar Enterprises, Inc. and he, under the terms of his agreement with Elvis Presley, licensed or sublicensed Boxcar Enterprises, Inc. to act on behalf of Elvis Presley to create and promote merchandise and articles using the name, likeness and image of Elvis Presley. (Exhibits P 5; Diskin Affidavit; Parker Affidavit).

18. There have been no licenses or assignments by Elvis Presley to Boxcar Enterprises, Inc. There have been only letters setting in writing the agreed division of the royalties and income from the sale of merchandise by Boxcar Enterprises, Inc. (Diskin Affidavit; Exhibit P 5. *See* Parker Affidavit).

19. The right to the commercial use of the name, likeness and image which Boxcar

Enterprises has is derived from the license or sublicense granted to Boxcar by Col. Parker. Col. Parker's rights derive from the January 22, 1976 contract (Exhibit P 1) he entered into with Elvis Presley which will terminate in 1983. It is understood that the Parker-Boxcar agreement terminates at the same time. (Exhibit P 6; Diskin Affidavit. *See* Parker Affidavit).

20. In a letter dated August 23, 1977, one week after Elvis Presley's death, Vernon Presley, Elvis' father and the executor of Elvis' estate, asked Col. Parker to "carry on according to the same terms and conditions" of the agreement between Elvis Presley and Col. Parker dated January 22, 1976. (Exhibit P 3). In June 1979, after Vernon Presley's death, the Estate of Presley, through its representatives again reaffirmed the agreement between Col. Parker and Elvis Presley. (Exhibit P 4). The Estate's continued desire to have Col. Parker market the name, likeness and image of Elvis and, thus, obtain income for the estate is based on the Estate's position that Parker "could probably make the most of the opportunity that was there plus maintain the quality that he and Elvis had maintained throughout the period of their relationship." (Hanks Testimony Tr. pp. 22–26).

21. Boxcar Enterprises, Inc. and the Estate agreed by letter dated August 24, 1977, to Boxcar's continued payment to the Estate of royalties from the sale of merchandise. (Exhibit P 2).

22. Two days after Elvis Presley's death, on August 18, 1977, Boxcar Enterprises, Inc. granted an exclusive license to Factors Etc., Inc. (Factors) to use the name, likeness, characters, symbols, designs and visual representations of Elvis Presley, termed the "Feature," on merchandise throughout the world for a period of eighteen (18) months, renewable for four (4) one-year periods thereafter. The license specifically reserved to the licensor the right, title and interest to the Feature and specifically stated that the rights granted were not an assignment but only a license. The license sets forth quality control provisions for standards for the merchandise and specifically states that the rights licensed shall revert to the licensor upon the termination of the license. (Exhibit P 6; Turner Testimony, Tr. pp. 67–68).

23. As an inducement for Factors Etc., Inc. to enter into the license agreement with Boxcar Enterprises, Inc., Vernon Presley as Executor of the Estate, executed the agreement on a separate page, confirming "the truth of the representations and warranties of Boxcar contained in the agreement." (Exhibit P 6).

24. In the license between Boxcar and Factors, Boxcar sets forth that it "has exclusive ownership of all rights to the use of the Feature," that it is "the sole owner of the entire right, title and interest in the Feature when used in connection with . . . merchandise," and that it has the "full right, authority and power to enter into this Agreement." (Exhibit P 6). Because of Boxcar's arrangement with Col. Parker, his control of Boxcar and his exclusive representation contract of Elvis Presley for seven years (or until 1983) (Exhibit P 1; Hanks Affidavit, Minutes of First Meeting of Incorporation), these representations, considering the time period of the license to Factors, though not completely accurate, were true as far as necessary for Factor's protection to operate under the license. No one else had the license rights for merchandise but Col. Parker/Boxcar. Given the time frame of the execution of the agreement (two days after Elvis Presley's death) and knowing of the agreement (Exhibit P 1) between Elvis Presley and Col. Parker, Vernon Presley's signature as "an inducement" cannot be considered an assignment of rights or a confirmation of an assignment, but rather an affirmation of Col. Parker's/Boxcar's exclusive *license* rights for a period of years. The continued understanding of the parties confirms that there has been no assignment of rights by Elvis Presley or his Estate but merely the licensing of the right to exploit commercially Elvis Presley's name, likeness and image for merchandise for a limited period of time. (Turner Testimony, Tr. p. 67; *see* Diskin Affidavit).

25. Elvis Presley's popularity did not cease upon his death. His records and tapes are still sold in considerable dollar and unit amounts and Elvis Presley movies are still shown in theaters and on television. Elvis Presley merchandise is still in demand and sold. Also, many people travel to Memphis, Tennessee to visit Presley's gravesite and to see Graceland Mansion, his former home. The extent of Presley's continued popularity and the value and goodwill associated with him and his performances on, for example, records, film, and tape, is evidenced by the over seven (7) million dollars in royalty and licensing payments which Presley's estate received in the first two years of its existence. (Hanks Affidavit; Hanks Testimony, Tr. p. 19; Parker Affidavit. *See* Davis Affidavit).

26. The agreements, including the Boxcar-Factors contract, relative to the commercial use of Elvis Presley's name, likeness and image are terminable. Upon their termination the existing rights to the name, likeness and image of Elvis Presley revert ultimately to the Estate. (Turner Testimony, Tr. p. 67; Diskin Affidavit).

27. Further, the Estate, during the existence of the agreements, that is, prior to their termination, has an interest in protecting the licensed rights not only for their value upon their reversion to it, but also to protect its continued royalties, which it receives from the licensees' sales of records, movies, merchandise and television performances of Elvis Presley. The Estate's licensees advertise and promote the marks identifying Presley's entertainment services and licensed merchandise to maintain their commercial value and goodwill. (Exhibit P 2; Hanks Testimony, Tr. pp. 18–20, 76–77).

28. The Estate has entered into a license agreement for the use of the logo TCB and the lightning bolt design to identify a band composed of the members of Elvis Presley's back-up band. The Estate receives royalties. (Exhibit P 23; Jarvis Testimony, Tr. p. 55; Hanks Testimony, Tr. pp. 76–77).

29. The Estate, with the agreement of Col. Parker, has entered into a movie contract with Warner Bros. Studio for a movie about Elvis Presley. (Exhibit P 22; Hanks Testimony, Tr. p. 76).

30. The Estate and its licensees and sub-licensees, and during his lifetime, Elvis Presley and his representatives and those with whom he had contracts or licenses have taken actions to protect the rights of the Estate and of the licensees. (Parker, Affidavit; Davis Affidavit; Hanks Testimony, Tr. pp. 82–83). For example, the Estate has filed an opposition against the registration by defendant Russen of a trademark (Hanks Testimony, Tr. pp. 82–83) and Factors Etc., Inc. has instituted law suits. (*See Factors Etc., Inc. v. Pro Arts, Inc.*, 444 F.Supp. 288 (S.D.N.Y.1977) (preliminary injunction), *aff'd*, 579 F.2d 215 (2nd Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); 494 F.Supp. 1090 (S.D.N.Y.1980) (permanent injunction); *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279 (S.D.N.Y.1977); *Memphis Development Foundation v. Factors Etc., Inc.*, 441 F.Supp. 1323 (W.D.Tenn.), *rev'd*, 616 F.2d 956 (6th Cir. 1980).)

*Defendant*

31. Defendant, Rob Russen d/b/a THE BIG EL SHOW (hereafter Russen) is the producer of THE BIG EL SHOW.

32. THE BIG EL SHOW is a stage production patterned after an actual Elvis Presley stage show, albeit on a lesser scale, and featuring an individual who impersonates the late Elvis Presley by performing in the style of Presley. The performer wears the same style and design of clothing and jewelry as did Presley, hands out to the audience scarves as did Presley, sings songs made popular by Presley, wears his hair in the same style as Presley, and imitates the singing voice, distinctive poses, and body movements made famous by Presley. (Exhibit P 11, 12, 14, 15; Exhibit D to Defendant's Answer; Jarvis Testimony, Tr. pp. 45–53; Russen Deposition, pp. 27–28, 54–55, 59).

33. Russen charges customers to view performances of THE BIG EL SHOW or alternatively charges fees to those in whose rooms or auditoriums THE BIG EL SHOW

is performed who in turn charge customers to view THE BIG EL SHOW. (Exhibit D to Defendant's Answer).

34. THE BIG EL SHOW production runs for approximately ninety minutes. The show opens with the theme from the movie "2001—A Space Odyssey" which Elvis Presley also used to open his stage shows. (Exhibit D to Defendant's Answer; Jarvis Testimony, Tr. p. 62). The production centers on Larry Seth, "Big El," doing his Elvis Presley impersonation and features musicians called the TCB Band. The TCB Band was also the name of Elvis Presley's band; however THE BIG EL SHOW TCB Band does not consist of musicians from Presley's band. (Jarvis Testimony, Tr. pp. 53–57; Exhibits P 11, 14, 15, 17A–C, 23; Russen Deposition, pp. 53–54).

35. From the inception of THE BIG EL SHOW, the star was Larry Seth. Seth, who is under a long-term contract with THE BIG EL SHOW, recently "retired" from the show; but he may return. (Russen Affidavit; see Russen Deposition, p. 171). THE BIG EL SHOW has continued its performances by using replacements for Seth. (Russen Deposition, pp. 91–92).

36. THE BIG EL SHOW was first presented in 1975 (Russen Affidavit; Russen Deposition, p. 22; Exhibit D to Defendant's Answer) and has been performed in the United States and Canada. For example, performances have been given in cities and towns in Connecticut, Maryland, New Jersey, Pennsylvania, and Nevada (one engagement at a Hotel-Casino in Las Vegas). (Russen Deposition, pp. 28–33, 37, 91; Exhibits P 14, 19, 17C; Exhibit D to Defendant's Answer). In addition, Larry Seth as the star of THE BIG EL SHOW has appeared on television talk shows in Philadelphia and Las Vegas, and on the David Suskind Show, a nationally syndicated program. (Exhibit P 17C; Russen Deposition, pp. 55–56, 167).

37. Russen has advertised the production as THE BIG EL SHOW and displayed a photograph of the star, Larry Seth, or an artist's rendering of Seth dressed and posed as if in performance. The advertisements make such statements as "Reflections on a Legend . . . A Tribute to Elvis Presley," "Looks and Sounds LIKE THE KING," "12 piece Las Vegas show band." (Russen Deposition, p. 176; Exhibits P 14, 15).

38. Although the various pictures and artist's rendering associated with THE BIG EL SHOW are photographs of Larry Seth, or based on such photographs (Russen Affidavit; Exhibit P 28), a reasonable viewer upon seeing the pictures alone would likely believe the individual portrayed to be Elvis Presley. Even with a side-to-side comparison of photographs of Larry Seth as Big El and of certain photographs of Elvis Presley, it is difficult, although not impossible, to discern any difference.

39. On October 18, 1978, Russen applied to the United States Patent and Trademark Office to register the name THE BIG EL SHOW and the design feature, of that name, i. e., an artist's rendition of Larry Seth as Big El, as a service mark. (Exhibit P 28). Plaintiff did prepare and timely file its Notice of Opposition in the United States Patent and Trademark Office to contest the defendant's right to register the mark. (Exhibit F to Plaintiff's Memorandum in Support of the Motion for Preliminary Injunction). The proceeding before the Trademark Trial and Appeal Board has been stayed by the Board pending the results in the suit before this court.

40. Russen has produced or had produced for him records of THE BIG EL SHOW (including two albums and three 45 RPMs). (Russen Deposition, pp. 72–74; see Exhibits P 11, 13, 18). Only a limited number of these records were pressed, and they were made for sales and promotional purposes. (Russen Deposition, pp. 73–74). One record album, entitled "Viva Las Vegas" (Exhibit P 11), has on the cover of the jacket only the title and an artist's sketch which upon reasonable observation appears to be of Elvis Presley. It is only on the back of the jacket in a short blurb and in the credits that the name BIG EL SHOW appears. It is also indicated that the show stars Larry Seth as Big El and features the TCB Band. The other album (Exhibit P 13) is entitled BIG

EL SHOW "In Concert" and also features an artist's drawing, ostensibly of Big El, but which looks like Elvis Presley, with microphone in hand, singing. Only one of the 45s has been presented to this court. THE BIG EL SHOW insignia (Exhibit P 28) appears on both sides. The artists are designated as Larry Seth and TCB Orchestra, on Side I, and Larry Seth and PCB [sic] Orchestra on Side II.

41. In addition to selling records at performances of THE BIG EL SHOW, Russen sold Big El pendants and a button with the picture of Larry Seth as Big El. (Russen Deposition, pp. 77–78).

42. Russen began to produce THE BIG EL SHOW and to use his certain identifying marks, such as THE BIG EL SHOW logo, after Presley had become famous as one of the premier performers in the world and had used and established certain marks as strongly identifying his services and the merchandise licensed or sub-licensed by him.

43. Russen has never had any authorization from, license or contractual relation with Elvis Presley or with the Estate of Elvis Presley in connection with the production of THE BIG EL SHOW. (Parker Affidavit; Hanks Affidavit; Hanks Testimony, Tr. pp. 79–80).

### DISCUSSION and CONCLUSIONS OF LAW

I. *Standing*

The issue of standing requires us to determine "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis in original). Plaintiff has shown that it has an economic interest in the protection of the rights it asserts, for it receives royalty or percentage payments from those who sell merchandise using the name, likeness and image of Elvis Presley. Further, it receives payments from record sales, has entered into motion picture contracts and has licensed the TCB logo. (*Cf. Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 222 (2nd Cir. 1978) ("... income interest, continually produced from Boxcar's exclusive right of commercial exploitation should inure to Presley's estate at death like any other intangible property right.")).

Perhaps an even more compelling reason for granting standing than the Estate's income from the current licensing agreements, is the Estate's protection of and future ability to generate income from those property rights, such as the use of trademarks or service marks, associated with Elvis Presley's entertainment services which became owned by Presley's estate after his death. *See generally* Trademarks and Tradenames, 74 Am.Jur.2d, § 25 (1974).[2] It has been shown that those parties who have entered into agreements with Elvis Presley, or with his Estate, to make use of the name, likeness and image of Presley have been licensees. None of the agreements between Elvis Presley and others, including his manager and agent, Thomas A. (Col.) Parker, indicate that Presley assigned his right, title and interest to those property rights connected with his name, likeness and/or image. While the terms, "assignment," "exclusive license," and "license" are frequently used by courts and practitioners interchangeably, the differences are significant. An assignment passes legal and equitable title to the property while a license is mere permission to use. Assignment is the transfer of the whole of the interest in the right while in a license the owner retains the legal ownership of the property. Vandenburgh, *Trademark Law and Procedure*, 2d Ed. § 7.31; Gilson, *Trademark Protection and Practice* § 6.01.

An assignment presupposes the transfer of the entire interest in a trademark, while a license involves the transfer of something less than the entire interest,

---

**2.** *See* the discussion, *infra*, concerning the Estate's ownership of certain trademarks and service marks.

and does not affect the licensor's title. The assignee becomes the new owner while the licensee is a mere user. *If the grant of an exclusive use of a trademark is limited as to duration or area, it will not confer title thereto upon the licensee* or upon the party who purchases the trademarked article for resale. The licensee acquires only the right to a limited use of the trademark, for the title to the reversionary interest in that use remains with the owner. . . . The licensor is merely estopped from challenging the licensee's use of the mark under the agreement. In principle, an assignment is permanent and perpetual, while a license is temporary, provisional or conditional. (emphasis added).

Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* (hereafter "Callmann"), § 78.2 (3d ed. 1969). Thus, even if Presley had licensed certain property rights such as service marks, the ownership of these rights and standing to protect them, remained with Presley, and, after his death became part of the assets of his estate. If, as is alleged by the plaintiff, the defendant's use of certain logos or advertising is likely to have a negative impact on these intangible property rights or on the goodwill associated with Presley or his Estate, then a sufficient reason for granting standing exists. As it has been noted with respect to trademark infringement, "[s]tanding to sue exists in anyone who 'is or is likely to be damaged' by the defendant's use of the disputed mark, and the parties need not be direct competitors. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 151 (9th Cir. 1963), *cert. den.,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053." *National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 376 F.Supp. 733, 746 (S.D.N.Y.), *affirmed,* 497 F.2d 1343 (2nd Cir. 1974). In addition, we are convinced that "the [plaintiff's] personal stake in the outcome [is] compelling enough to assure aggressive and conscientious advocacy and that the issues" . . . [are not] . . . "so nebulous as to create the danger of judicial inquiry beyond customary bounds." *Schiaffo v. Helstoski,* 492 F.2d 413 (3rd Cir. 1974).

## II. *Laches and Acquiescence*

■ Russen, having asserted the defenses of laches, and acquiescence in his Answer, argues that a preliminary injunction should not be granted. Although it has been noted that "there are cases in which preliminary injunctive relief has been held barred by laches . . . [citations omitted]," *Selchow & Righter Co. v. Book-of-the Month Club, Inc.,* 192 U.S.P.Q. 530, 532 (S.D.N.Y.1976) (action for trademark and copyright infringement, unfair competition and trademark dilution); *see Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1041 (2nd Cir. 1980) (federal trademark, unfair competition, false designation of origin); *Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 609 (S.D.N.Y.1979), "the laches defense is reserved for those rare cases where a protracted acquiescence by plaintiff induces a defendant to undertake substantial activities in reliance on the acquiescence." *McNeil Laboratories, Inc. v. American Home Products Corp.,* 416 F.Supp. 804, 809 (D.N.J.1976). *See, e. g., Jenn-Air Corp. v. Penn Ventilator Co.,* 464 F.2d 48 (3rd Cir. 1972); *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292 (E.D.Pa. 1976); Callmann, § 87.3(b). In any event "laches generally is not a bar to injunctive relief against unfair competition." *Great Atlantic & Pacific Tea Co. v. A & P Trucking Corp.,* 51 N.J.Super. 412, 423, 144 A.2d 172 (App.Div.), *modified and remanded,* 29 N.J. 455, 149 A.2d 595 (1959). The equitable defense of acquiescence " '[a]s distinguished from laches, constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant.' [citations omitted]" *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 704 (2nd Cir. 1970).

■ In deciding whether the defendant has made a sufficiently strong showing of laches or acquiescence, we must examine the particular circumstances of the case.

*Id.* at 703–04. *See Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414, 434–35 (S.D.N.Y.1980). Our review of the available evidentiary sources indicates certain unsettled facts; however, we cannot conclude that the defendant has met his burden of proving, for the purposes of this preliminary injunction motion, laches or acquiescence.

In the first place, the defendant has not made a sufficient showing of implicit or explicit consent or inexcusable delay by the plaintiff. Although there is evidence that THE BIG EL SHOW, with Larry Seth starring, has been performed since 1975 (Findings of Fact # 35, # 36, *supra* ), Russen's application to register the mark THE BIG EL SHOW and DESIGN states that the first use of the mark was in June of 1978.

Of more importance, there is a significant question as to the "knowledge and acquiescence" of the Estate or its representatives or of Elvis Presley or his representatives. Russen stated that Presley and his manager, Col. Parker, were aware of the existence of THE BIG EL SHOW, that he, Russen, had spoken via telephone with Col. Parker, in June of 1977, and that Col. Parker had indicated that neither he nor Presley had any objection to THE BIG EL SHOW being performed or using the name THE BIG EL SHOW. (Russen Affidavit).

This purported acceptance by Parker is apparently contradicted by Parker's statement that "[a]t no time was defendant granted any rights by me, Boxcar Enterprises or anyone on behalf of Elvis Presley, to use Elvis' name, image, picture or likeness in any theatrical or entertainment endeavor." (Parker Affidavit). In addition, Joseph Hanks, a co-executor of the Estate

of Elvis Presley, indicated that the Estate's files contained no references to Russen or THE BIG EL SHOW and that neither he nor any of the co-executors authorized or approved any uses by the defendant of Elvis Presley's name or image. (Hanks Affidavit; Hanks Testimony, Tr. p. 79). Finally, as noted above, the Estate of Elvis Presley and its licensee, Factors Etc., Inc., have taken steps, in addition to the present suit, to protect the rights of the Estate. The Estate did file a timely Notice of Opposition to Russen's application to register THE BIG EL SHOW and DESIGN as a service mark (Exhibit P 28; Exhibit F to Plaintiff's Memorandum in Support of the Motion for Preliminary Injunction), and Factors has instituted different legal actions.

Russen has also failed to show adequately that he was prejudiced by the delay. Although we assume Russen may have made some expenditures to produce and promote THE BIG EL SHOW and a limited number of records, Russen has failed to establish that his activities constituted the necessary prejudice. *See Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.,* 350 F.Supp. 1341, 1364–68 (E.D.Pa.1972), *aff'd without opinion,* 480 F.2d 917 (3rd Cir. 1973); *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 615 (7th Cir. 1965). *See also Jenn-Air Corp., supra.*

Since we have concluded that Russen has not made a sufficient showing of laches or acquiescence by Presley or his representatives or by the Estate of Presley to bar a preliminary injunction, we must now decide if a preliminary injunction should issue.[3]

### III. *Preliminary Injunction Standards*

To prevail on a motion for a preliminary injunction, the moving party must show

---

**3.** It should be noted that the existence of other persons engaging in the same behavior as the defendant, assuming such persons do in fact exist, will not preclude our issuing an injunction. It has been noted that,

> Numerous cases have held that the existence of infringers other than defendant, against whom the plaintiff has not instituted legal action, is irrelevant in determining whether injunctive relief should issue against the defendant. *E. g. McNeil Laboratories v. American Home Products Corp.,* 416 F.Supp. 804

(D.N.J.1976); *International Order of Job's Daughters v. Lindeburg & Co.,* 196 U.S.P.Q. 461 (N.D.Cal.1977); *United States Jaycees v. San Francisco Junior Chamber of Commerce,* 354 F.Supp. 61, 73 (N.D.Cal.1972), *aff'd,* 513 F.2d 1226 (9th Cir. 1977), and cases cited therein; *see also* 4 Callmann, *The Law of Unfair Competition, Trademarks and Monopolies,* § 87.3(e) at 152 (3d Ed. 1970).

*Playboy Enterprises, Inc.,* 486 F.Supp. at 423 n.9.

that it has a reasonable likelihood of eventual success in the litigation, that it will be irreparably injured *pendente lite* if relief is not granted, that a balance of equities favor the plaintiff, and that the public interest considerations support the preliminary injunction's issuance. *SK&F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055 (3rd Cir. 1980). *See Tefal, S.A. v. Products International Co.*, 186 U.S.P.Q. 545, 547–48 (D.N.J.1975), *aff'd*, 529 F.2d 495, 497 (3rd Cir. 1976); *Fotomat Corp. v. Photo Drive-Thru, Inc.*, 425 F.Supp. 693, 701 (D.N.J.1977); *McNeil Laboratories, supra.* These elements will be evaluated in light of the various causes of action asserted by the plaintiff. We shall first examine the likelihood of plaintiff's success on each claim.

### A. *Likelihood of Success on the Merits*

### 1. *Right of Publicity*

The plaintiff has asserted that the defendant's production, THE BIG EL SHOW, infringes on the right of publicity which plaintiff inherited from Elvis Presley.

■ ■ The right of publicity[4] is a concept which has evolved from the common law of privacy and its tort "of the appropriation, for the defendant's benefit or advantages, of the plaintiff's name or likeness."[5] The term "right of publicity" has since come to signify the right of an individual, especially a public figure or a celebrity, to control the commercial value and exploitation of his name and picture or likeness and to prevent others from unfairly appropriating this value for their commercial benefit.[6] The idea generally underlying an action for a right of privacy is that the individual has a right personal to him to be let alone and, thus, to prevent others from invading his privacy, injuring his feelings, or assaulting his peace of mind. In contrast, underlying the right of publicity concept is a desire to benefit from the commercial exploitation of one's name and likeness.[7]

In the present case, we are faced with the following issues: a. Does a right of publicity and the concomitant cause of action for its infringement exist at common law in

---

**4.** The term "right of publicity" was first coined by Judge Jerome Frank in the case of *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2nd Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953).

**5.** W. Prosser, Law of Torts, 804 (4th ed. 1971). *See, e. g., Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 221 (2nd Cir. 1978).

**6.** The right of a person, whether or not termed "right of publicity," to control the commercial value and exploitation of his or her name and likeness has received wide recognition in the courts. *See, e. g., Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 575–78, 97 S.Ct. 2849, 2857–2859, 53 L.Ed.2d 965 (1977); *Memphis Development Foundation v. Factors*, 441 F.Supp. 1323, 1325–26, 1330 (W.D.Tenn. 1977), *rev'd on different grounds*, 616 F.2d 956, 957–58 (6th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980). *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 221 (2nd Cir. 1978) (Preliminary Injunction), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Price v. Worldvision Enterprises, Inc.*, 455 F.Supp. 252 (S.D.N.Y.1978), *aff'd without opinion*, 603 F.2d 214 (2nd Cir. 1979); *Cepeda v. Swift & Co.*, 415 F.2d 1205, 1206 (8th Cir. 1969); *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2nd Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98

L.Ed. 343 (1953); *Factors Etc., Inc. v. Pro Arts, Inc.*, 496 F.Supp. 1090 (S.D.N.Y.1980); *Hicks v. Casablanca Records*, 464 F.Supp. 426 (S.D.N.Y. 1978); *Ali v. Playgirl, Inc.*, 447 F.Supp. 723, 728 (S.D.N.Y.1978); *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279, 282 (S.D.N.Y.1977); *Price v. Hal Roach Studios*, 400 F.Supp. 836, 843–46 (S.D.N.Y.1975); *Grant v. Esquire, Inc.*, 367 F.Supp. 876, 880 (S.D.N.Y.1973); *Uhlaender v. Hendricksen*, 316 F.Supp. 1277, 1280–83 (D.Minn.1970); *Lugosi v. Universal Pictures Co.*, 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979); *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454 (1979); *Canessa v. J. I. Kislak, Inc.*, 97 N.J.Super. 327, 335–52, 235 A.2d 62 (1967); *Edison v. Edison Polyform Mfg. Co.*, 73 N.J.Eq. 136, 67 A. 392 (1907); *Hogan v. A. S. Barnes & Co., Inc.*, 114 U.S.P.Q. 314 (Pa.Ct.Comm.Pls. Phila.Cty.1957); *Hirsch v. S. C. Johnson & Son, Inc.*, 90 Wis.2d 379, 280 N.W.2d 129 (1979).

**7.** *See, e. g., Lugosi*, 25 Cal.3d at 834–44, 160 Cal.Rptr. at 335–42, 603 P.2d at 437–444 (Bird, C. J., dissenting). *See also Hogan v. A. S. Barnes & Co., Inc.*, 114 U.S.P.Q. 314, 315–16, 320 (Pa.Ct.Comm.Pls.Phila.Cty.1957). *See generally* Note, The Right of Publicity—Protection for Public Figures and Celebrities, 42 Brooklyn L.Rev. 527 (1976).

New Jersey; if so, does this right descend to the estate at the death of the individual? b. Assuming the existence and inheritability of a right of publicity, does the presentation of THE BIG EL SHOW infringe upon the plaintiff's right of publicity?

a. *Right of Publicity in ·New Jersey*

Although the courts in New Jersey have not used the term "right of publicity," they have recognized and supported an individual's right to prevent the unauthorized, commercial appropriation of his name or likeness. In the early and widely cited case of *Edison v. Edison Polyform Mfg. Co.*, 73 N.J.Eq. 136, 67 A. 392 (1907), Thomas Edison sought to enjoin a company which sold medicinal preparations from using the name Edison as part of its corporate title or in connection with its business and from using his name, picture, or endorsement on the label of defendant's product or as part of the defendant's advertising. In granting the requested relief, the court concluded that:

> If a man's name be his own property, as no less an authority than the United States Supreme Court says it is ... it is difficult to understand why the peculiar cast of one's features is not also one's property, and why its pecuniary value, if it has one, does not belong to its owner rather than to the person seeking to make an unauthorized use of it.

*Id.* at 141. This idea that an individual has a property right in his name and likeness was reemphasized in *Ettore v. Philco Television Broadcasting Corporation*, 229 F.2d 481, 491–92 (3rd Cir.), *cert. denied*, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956) (interpreting New Jersey law) and *Canessa v. Kislak*, 97 N.J.Super. 327, 235 A.2d 62 (Law Div.1967). *Cf. Palmer v. Schonhorn*, 96 N.J.Super. 72, 232 A.2d 458 (Ch.1967). (The court did not characterize the right as property. However, the court held:

> that although the publication of biographical data of a well-known figure does not *per se* constitute an invasion of privacy, the use of that same data [as well as the name] for the purpose of

capitalizing upon the name by using it in connection with a commercial project other than the dissemination of news or articles or biographies does.

*Id.* at 79, 232 A.2d 458.) Judge Lynch in his thoughtful opinion in *Canessa* initially found that "in the concept of 'right of privacy' there is implicit the right of property, at least in the instance of an appropriation by defendant of another's likeness." 97 N.J.Super. at 339, 235 A.2d 62. After a comprehensive examination of a number of cases occurring prior to *Canessa*, Judge Lynch decided that:

> Entirely apart, however, from the metaphysical niceties, the reality of a case such as we have here is, in the court's opinion, simply this: plaintiffs' names and likenesses belong to them. As such they are property. They are things of value. Defendant has made them so, for it has taken them for its own commercial benefit.
>
> . . . . .
>
> New Jersey has always enjoined the use of plaintiff's likeness and name on the specific basis that it was a protected property right. It is as much a property right after its wrongful use by defendant as it might be before such use.
>
> . . . . .
>
> We therefore hold that, insofar as plaintiffs' claim is based on the appropriation of their likeness and name for defendant's commercial benefit, it is an action for invasion of their "property" rights and not one for "injury to the person."

97 N.J.Super. at 351–52, 235 A.2d 62.

▮ In following the approach taken by pre-1968 cases evaluating New Jersey law, we conclude that, today, a New Jersey court would allow a cause of action for infringement of a right of publicity. In addition, this right, having been characterized by New Jersey courts as a property right, rather than as a right personal to and attached to the individual, is capable of being disassociated from the individual and transferred by him for commercial pur-

poses.[8] We thus determine that during his life Elvis Presley owned a property right in his name and likeness which he could license or assign for his commercial benefit.

In deciding whether this right of publicity survived Presley's death, we are persuaded by the approach of other courts which have found the right of publicity to be a property right. These courts have concluded that the right, having been exercised during the individual's life and thus having attained a concrete form, should descend at the death of the individual "like any other intangible property right." *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279, 284 (S.D.N.Y.1977).[9] As Chief Justice Bird of the California Supreme Court has explained:

> . . . granting protection after death provides an increased incentive for the investment of resources in one's profession, which may augment the value of one's right of publicity. If the right is descendible, the individual is able to transfer the benefits of his labor to his immediate successors and is assured that control over the exercise of the right can be vested in a suitable beneficiary. "There is no reason why, upon a celebrity's

death, advertisers should receive a windfall in the form of freedom to use with impunity the name or likeness of the deceased celebrity who may have worked his or her entire life to attain celebrity status. The financial benefits of that labor should go to the celebrity's heirs. . . ." [citations omitted].

*Lugosi*, 25 Cal.3d at 846, 160 Cal.Rptr. at 344, 603 P.2d at 446 (Bird, C. J., dissenting). Following the line of reasoning in the above cases, we hold that Elvis Presley's right of publicity survived his death and became part of Presley's estate.[10]

b. *Theatrical Imitations and The Right of Publicity*

■ Having found that New Jersey supports a common law right of publicity, we turn our attention to a resolution of whether this right of publicity provides protection against the defendant's promotion and presentation of THE BIG EL SHOW. In deciding this issue, the circumstances and nature of defendant's activity, as well as the scope of the right of publicity, are to be considered. In a recent law journal article, the authors conducted an extensive and thorough analysis of the cases and theories

---

**8.** *See, e. g., Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 220–21 (2nd Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Cepeda v. Swift & Co.*, 415 F.2d 1205, 1206 (8th Cir. 1969); *Hicks v. Casablanca Records*, 464 F.Supp. 426, 429–30 (S.D.N.Y. 1978); *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836, 843–46; *Uhlaender v. Hendricksen*, 316 F.Supp. 1277, 1282 (D.Minn.1970); *Cf. Lugosi v. Universal Pictures*, 25 Cal.3d 813, 832–49, 160 Cal.Rptr. 335–45, 603 P.2d 437–447 (1979) (Bird, C. J., dissenting) (Bela Lugosi could have created a property right by exploiting his name or likeness during his lifetime. *Id.* at 326–28.) *Contra Memphis Development Foundation v. Factors*, 616 F.2d 956, 958–60 (6th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 358, 66 L.Ed.2d 217 (1979).

**9.** *See* cases cited in note 8, *supra*. *See generally*, Felcher & Rubin, The Descendibility of the Right of Publicity: Is There Commercial Life After Death?, 89 Yale L.J. 1125 (1980); Gordon, Right of Property in Name, Likeness, Personality and History, 55 N.W.L.Rev. 553 (1960); Note, Descent of the Right of Publicity, 29 Hast.L.J. 751 (1978); Note, The Right of Publicity—Protection for Public Figures and Celebrities, 42 Brooklyn L.Rev. 527 (1976). *Cf. Zac-*

chini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 576, 97 S.Ct. 2849, 2857–2858, 53 L.Ed.2d 965 (1978) (Analogizing the right of publicity to patent and copyright law).

**10.** As in *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 222 at n.11 (2nd Cir. 1978), we "need not, and therefore do not, decide whether the right would survive the death of the celebrity if not exploited during the celebrity's life" since Presley exercised the right to commercially exploit his name and likeness during his life. Presley's name and likeness were exploited through contracts and licenses in connection with Elvis Presley entertainment, including live musical performances, movies, records and television performances, and consumer products such as jewelry and t-shirts.

Since we are not directly faced with the issue of whether there should be a durational limit on the right of publicity after it is inherited, we will not decide this question. However, the court suggests that a length of time should be set by the New Jersey State legislature. The Federal Copyright Act, 17 U.S.C. §§ 302, 305 provides guidelines which may be informative in this situation.

bearing on media portrayals, *i. e.*, the portrayal of a real person by a news or entertainment media production. Felcher & Rubin, Privacy, Publicity, and the Portrayal of Real People by the Media, [hereinafter "Portrayal"] 88 Yale L.J. 1577, 1596 (1979). They concluded that "[t]he primary social policy that determines the legal protection afforded to media portrayals[11] is based on the First Amendment guarantee of free speech and press." *Id.* at 1596. Thus, the purpose of the portrayal in question must be examined to determine if it predominantly serves a social function valued by the protection of free speech. If the portrayal mainly serves the purpose of contributing information, which is not false or

defamatory, to the public debate of political or social issues or of providing the free expression of creative talent which contributes to society's cultural enrichment,[12] then the portrayal generally will be immune from liability. If, however, the portrayal functions primarily as a means of commercial exploitation, then such immunity will not be granted. *See generally* Portrayal, *supra*, at 1596–99.[13]

The idea that the scope of the right of publicity should be measured or balanced against societal interests in free expression has been recognized and discussed in the case law[14] and by other legal commentators.[15] In general, in determining whether

11. The authors have attempted to collapse the concepts of right of privacy and right of publicity for the particular situation of media portrayals. The court has decided not to follow this merger idea and, as noted in the prior section, will treat the right of publicity, the commercial appropriation of an individual's name and likeness, as a doctrine distinct from the right of privacy.

12. As the authors note, "[t]he second function may not be as uniformly accepted as the first, but most commentators include it among the social purposes that the First Amendment serves...." *Id.* at 1597. For a more detailed discussion of the social functions served by freedom of speech, see, e. g., the authorities cited in Portrayal at 1597, n.93–95.

13. The authors also discuss other, albeit less important, policies bearing on media portrayals. These policies focus on the harm to the plaintiff and include: the protection of the freedom of the individual against the disclosure of certain types of information; the prevention of fraudulent business practices; and that of encouraging individual achievement by allowing people to profit from their own efforts. *Id.* at 1599–1601. These three policies emphasize that a showing of identifiable harm, either noneconomic or economic, supports recovery for unauthorized media portrayals where the portrayal is predominantly exploitative and not protected by First Amendment considerations. *Id.* at 1608–16.
Taking the two sets of principles (First Amendment concerns and identifiable harm) into account, the authors have proposed a two-step process whereby:
The first step is to determine whether the portrayal in question is exploitative [in that it does not serve a recognized social function of an informative or cultural nature]. If the portrayal is found to be exploitative, the next

step is to determine whether the plaintiff has suffered any identifiable harm, of either an economic or dignitary nature.
*Id.* at 1620.
We have not incorporated the harm element into our determination of likelihood of success on the merits. However, we have discussed the need for identifiable harm in the section, *infra*, on irreparable injury and the right of publicity.

14. *See, e. g., Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 569–79, 97 S.Ct. 2849, 2854–2859, 53 L.Ed.2d 965 (1977); *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d at 222. *Hicks v. Casablanca Records*, 464 F.Supp. 426, 430–33 (S.D.N.Y.1978); *Grant v. Esquire, Inc.*, 367 F.Supp. 876, 881 (S.D.N.Y.1973); *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860, 160 Cal.Rptr. 352, 355–62, 603 P.2d 454, 457–464 (1979) (Bird, C. J., concurring); *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768, 427 N.Y.S.2d 828, 829 (App.Div.1980); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 58 Misc.2d 1, 294 N.Y.S.2d 122, 129 (Sup. Ct.1968), *aff'd mem.*, 32 A.D.2d 892, 301 N.Y. S.2d 948 (1969); *Current Audio, Inc. v. RCA Corp.*, 71 Misc.2d 831, 337 N.Y.S.2d 949, 954–56 (Sup.Ct.1972). *Cf. Palmer v. Schonhorn Enterprises, Inc.*, 96 N.J.Super. 72, 78, 232 A.2d 458 (1968) (Although not referring explicitly to the First Amendment, the court discussed similar constraints on the use of a famous person's name and likeness).

15. Comment, Felcher & Rubin, The Descendibility of the Right of Publicity: Is There Commercial Life After Death?, 89 Yale L.J. 1125, 1127–29 (1980); Note, *Lugosi v. Universal Pictures*; Descent of the Right of Publicity, 29 Hastings L.J. 751, 769–72 (1978); Note, Human Cannonballs and the First Amendment: *Zacchini v. Scripps-Howard Broadcasting Co.*, 30

a plaintiff's right of publicity can be invoked to prevent a defendant's activity, the courts have divided along the lines set out above. In cases finding the expression to be protected, the defendant's activity has consisted of the dissemination of such information as "thoughts, ideas, newsworthy events, ... matters of public interest," [16] *Rosemont Enterprises, Inc. v. Random House, Inc.*, 58 Misc.2d 1, 6, 294 N.Y.S.2d 122, 129 (Sup.Ct.1968), *aff'd mem.*, 32 App. Div.2d 892, 301 N.Y.S.2d 948 (1969) (biography of Howard Hughes) and fictionalizations.[17] The importance of protecting fic-

tionalizations and related efforts as against rights of publicity was explained by Chief Justice Bird of the California Supreme Court:

> Contemporary events, symbols and people are regularly used in fictional works. Fiction writers may be able to more persuasively, more accurately express themselves by weaving into the tale persons or events familiar to their readers. The choice is theirs. No author should be forced into creating mythological worlds or characters wholly divorced from reali-

Stanford L.Rev. 1185 (1978); Note, The Right of Publicity-Protection for Public Figures and Celebrities, 42 Brooklyn L.Rev. 527, 549–57 (1976).

**16.** *See, e. g., Current Audio, Inc. v. RCA Corp.*, 71 Misc.2d 831, 837, 337 N.Y.S.2d 949, 954–56 (Sup.Ct.1972) ("First Amendment protects the discussion and reproduction of an Elvis Presley press conference on a 'talking magazine,' *i. e.*, a mixed medium that combines written material with a stereo record, as well as the picture of Elvis on the back cover.") (In discussing the scope of protected material, the court explained that "The scope of the subject matter which falls within the protected area of the 'newsworthy' or of 'public interest' extends far beyond the dissemination of news in the sense of current events and includes all types of factual, educational and historical data, or even entertainment and amusement...." *Id.* 337 N.Y. S.2d at 955); *Paulsen v. Personality Posters, Inc.*, 59 Misc.2d 444, 299 N.Y.S.2d 501 (Sup.Ct. 1968). *See also Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768, 427 N.Y.S.2d 828 (App.Div. 1980) (Concerning suit by Executor of the Estate of Marilyn Monroe against writer and publisher of the book "Marilyn" which was written and published some years after Monroe's death. The court perhaps took an overly expansive view of the right of expression as against a right of publicity:

> We think it does not matter whether the book is properly described as a biography, a fictional biography, or any other kind of literary work. It is not for a court to pass on literary categories, or literary judgment. It is enough that the book is a literary work and not simply a disguised commercial advertisement for the sale of goods or services. The protection of the right of free expression is so important that we should not extend any right of publicity, if such exists, to give rise to a cause of action against the publication of a literary work about a deceased person. *Id.* 427 N.Y.S.2d at 829); *Donohue v. Warner Bros. Pictures Distributing Corp.*, 2 Utah 2d 256, 272 P.2d 177 (1954).

**17.** *See Hicks v. Casablanca Records*, 464 F.Supp. 426 (S.D.N.Y.1978). In *Hicks*, the heir and assignees of the late Agatha Christie, the acclaimed mystery writer, sought to enjoin the distribution of the motion picture and the book *Agatha*. After evaluating the works, the court found that they were fictional and not biographical, and that the inclusion of the few "facts" did not result in the works being "'newsworthy'" or historical or "'fair comment.'" *Id.* at 431. Even though the works were fictional, the court concluded that the First Amendment protection of speech usually accorded novels and movies outweighed whatever publicity rights the plaintiffs may have possessed since there were no deliberate falsifications or attempts by defendant "to present the disputed events as true." *Id.* at 433. Accordingly, the court held that "the right of publicity does not attach ... where a fictionalized account of an event in the life of a public figure is depicted in a novel or a movie, and in such novel or movie it is evident to the public that the events so depicted are fictitious." *Id.* at 433. *See also Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454 (1979) (Bird, C. J., concurring). (In *Guglielmi* the nephew and heir to Rudolph Valentino sued defendants for their production and televising a "fictionalized version" of the life of the silent screen star. In her opinion concurring in the denial of relief, *id.* 25 Cal.3d at 860–76, 160 Cal.Rptr. at 353–63, 603 P.2d at 455–465, Chief Justice Bird conducted an informative analysis of the First Amendment rights which attached to the defendants' "use of a celebrity's identity in a constitutionally protected medium of expression, a work of fiction on film." *Id.* 25 Cal.3d at 875, 160 Cal.Rptr. at 361, 603 P.2d at 463. She concluded that the First Amendment prevented "[a] cause of action for the appropriation of Valentino's right of publicity through the use of his name and likeness in [defendants] film...." *Id.* 25 Cal.3d at 872, 160 Cal.Rptr. at 360, 603 P.2d at 462).

ty. The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire. Rather, prominence invites creative comment.[18]

*Guglielmi,* 25 Cal.3d at 869, 160 Cal.Rptr. at 358, 603 P.2d at 460 (Bird, C. J., concurring).

■ On the other hand, most of those cases finding that the right of publicity, or its equivalence, prevails have involved the use of a famous name or likeness predominantly in connection with the sale of consumer merchandise [19] or "solely 'for purposes of trade—*e. g.,* merely to attract attention.' [without being artistic, informational or newsworthy] *Grant v. Esquire, Inc.,* 367 F.Supp. 876, 881 (S.D.N.Y.1973) [unauthorized use of photo of Cary Grant in fashion article]." *Ali v. Playgirl, Inc.,* 447 F.Supp. 723, 727, 728–29 (S.D.N.Y.1978) (unauthorized drawing of nude man, recog-

nizable as Muhammed Ali, seated in corner of boxing ring). In these cases, it seems clear that the name or likeness of the public figure is being used predominantly for commercial exploitation, and thus is subject to the right of publicity. As the court in *Palmer v. Schonhorn, supra,* noted, "While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does *not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information." Id.* 96 N.J.Super. at 78, 232 A.2d 458 quoting *Gautier v. Pro-Football, Inc.,* 304 N.Y. 354, 359 (1952) (emphasis added by Palmer court). •

■ In the present case, the defendant's expressive activity, THE BIG EL SHOW production, does not fall clearly on either

**18.** This idea of creative comment precluding a right of publicity claim can be analogized to the doctrine of fair use in the copyright law. *See* 17 U.S.C. § 107. Although the right of publicity is not the same as a right in a copyright, there are similarities, particularly where a personality's likeness or name is closely connected with a distinctive style of performance. In some respects this situation is similar to a copyright in a character. *See Walt Disney Productions v. Air Pirates,* 581 F.2d 751 (9th Cir. 1978). The relation of the right of publicity to copyright has been noted by the Supreme Court in *Zacchini v. Scripps-Howard,* 433 U.S. 562, 573, 575–77, 97 S.Ct. 2489, 2857–2858, 53 L.Ed.2d 965 (1976).

The doctrine of fair use may provide guidance as to what types of uses of a name or likeness should be allowed. Fair use has been described as a "privilege in others than the owner of a copyright to use the copyright material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner...." Ball, Copyright and Literary Property 260 (1944). (Quoted approvingly in *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2nd Cir. 1966). As a general proposition, fair use cannot be invoked unless there is a substantial similarity between the two works in question. *See* Nimmer on Copyright, § 13.05[A] (1979). Once this barrier is overcome, the purpose for which the work is being used is considered. The defense of fair use has been allowed in connection with news reporting, criticism and review, satire, parody and burlesque. *Id.* at §§ 13.05[B], [C]. In addition to evaluating the function, the court also looks to "the effect of the use upon the potential market for or value of the copyrighted

work." 17 U.S.C. § 107(4). *See* Nimmer, *supra,* § 13.05[B].

**19.** *See, e. g., Factors Etc., Inc. v. Pro Arts, Inc., supra* (Elvis Presley posters); *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279, 284–85 (S.D.N.Y.1977) (Elvis Presley posters; distinguished from *Paulsen, supra* ); *Memphis Development Foundation v. Factors Etc., Inc.,* 441 F.Supp. 1323 (W.D.Tenn.1977) (pewter replicas of a statue of Elvis Presley), *rev'd on other grounds,* 616 F.2d 956 (6th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980); *Lombardo v. Doyle, Dane & Bernbach, Inc.,* 58 A.D.2d 620, 396 N.Y.S.2d 661, 664–65 (App.Div.1977) (automobile commercial on television); *Rosemont Enterprises, Inc. v. Urban Systems, Inc.,* 72 Misc.2d 788, 789–90, 340 N.Y.S.2d 144, 145–46 (Sup.Ct.), *modified,* 42 App. Div.2d 544, 345 N.Y.S.2d 17 (App.Div.1973) ("Howard Hughes" game which included Hughes' name and other biographical information); *Palmer v. Schonhorn Enterprises, Inc.,* 96 N.J.Super. 72, 232 A.2d 458 (Ch.1967) (names and biographies of famous golfers as part of board game). Cf. *Guglielmi,* 25 Cal.3d at 874–76, 160 Cal.Rptr. at 361, 603 P.2d at 463 (Bird, C. J., concurring) (pointing out that commercial products, such as plastic toys, soap products, target games, etc., "unlike motion pictures, are not vehicles through which ideas and opinions are regularly disseminated." Thus, the use of the individual's likeness or name in connection with the sale of such commercial products would not normally be considered an expression entitled to constitutional protection.

side. Based on the current state of the record, the production can be described as a live theatrical presentation or concert designed to imitate a performance of the late Elvis Presley.[20] The show stars an individual who closely resembles Presley and who imitates the appearance, dress, and characteristic performing style of Elvis Presley. The defendant has made no showing, nor attempted to show, that the production is intended to or acts as a parody, burlesque, satire, or criticism of Elvis Presley.[21] As a matter of fact, the show is billed as "A TRIBUTE TO ELVIS PRESLEY." In essence, we confront the question of whether the use of the likeness of a famous deceased entertainer in a performance mainly designed to imitate that famous entertainer's own past stage performances is to be considered primarily as a commercial appropriation by the imitator or show's producer of the famous entertainer's likeness or as a valuable contribution of information or culture. After careful consideration of the activity, we have decided that although THE BIG EL SHOW contains an informational and entertainment element, the show serves primarily to commercially exploit the likeness of Elvis Presley without contributing anything of substantial value to society.[22] In making this decision, the court recognizes that certain factors distinguish this situation from the pure commercial use of a picture of Elvis Presley to advertise a product. In the first place, the defendant uses Presley's likeness in an entertainment form and, as a general proposition, "entertainment . . . enjoys First Amendment protection." *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 578, 97 S.Ct. 2849, 2859, 53 L.Ed.2d 965 (1977). *See, e. g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557-58, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) (the musical play "Hair"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952) (the motion picture "The Miracle"); *Goldstein v. Town of Nantucket*, 477 F.Supp. 606, 608 (D.Mass.1979) (public performance of Nantucket's traditional folk music). However, entertainment that is merely a copy or imitation, even if skillfully and accurately carried out, does not really have its own creative component and does not have a significant value as pure entertainment.[23] As one authority has emphasized:

---

**20.** In addition to the production itself, the defendant has utilized advertising and promotional material in connection with the production. Some of the advertisements incorporate the name Elvis Presley and an artist's rendering of a person which, to the reasonable viewer appears to be of Elvis Presley. If the production is found to be protected, certain advertising should be allowed to properly inform the public as to the contents of the show. *See, e. g., Guglielmi*, 25 Cal.3d at 871-72, 160 Cal.Rptr. at 360, 603 P.2d at 462 (Bird, C. J., concurring); *Murray v. New York Magazine Co.*, 27 N.Y.2d 406, 318 N.Y.S.2d 474, 267 N.E.2d 256 (1971). The defendant has also sold, albeit in a small amount, records on which an image resembling Elvis Presley appears. We have examined the defendant's advertising and use of the likeness of Presley on records in greater detail in the sections, infra, on Unfair Competition and § 45(a) of the Lanham Act.

**21.** Using an analogy to copyright law and the doctrine of fair use, *see* note 18, *supra*, a parody, burlesque, satire or critical review might be allowed because of their "historic importance and social value," *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541, 544 (2nd Cir. 1964) and because of their contribution to society "both as entertainment and as a form of social and literary criticism." *Id.* at 545. *See Elsmere Music, Inc. v. National Broadcasting Co.*, 482

F.Supp. 741 (S.D.N.Y.), *aff'd*, 623 F.2d 252 (2nd Cir. 1980). Unlike a copier, a parodist or satirist adds his own new and creative touches to the original work, which, in this case, would be the likeness of Elvis Presley as he is performing. The original work basically becomes part of a new and different work which derives its popularity from the added creative elements. The original work, or the likeness of Elvis Presley, is being used in a different manner and for a different purpose. *See generally*, Nimmer, *supra*, §§ 13.05[B], [C].

**22.** Our decision does not foreclose the defendants from supplementing the record at the time of trial with further information bearing on the nature of his production.

**23.** The cessation of individual expression which merely copies or imitates another's likeness or expression does not really impinge on the First Amendment value of self-fulfillment or self-expression as espoused by Emerson, who has explained that:

. . . expression is an integral part of the development of ideas, of mental exploration and of the affirmation of self. The power to realize his potentiality as a human being be-

The public interest in entertainment will support the sporadic, occasional and good-faith imitation of a famous person to achieve humor, to effect criticism or to season a particular episode, but it does not give a privilege to appropriate another's valuable attributes on a continuing basis as one's own without the consent of the other.

Netterville, "Copyright and Tort Aspects of Parody, Mimicry and Humorous Commentary," 35 S.Cal.L.Rev. 225, 254 (1962).

In the second place, the production does provide information in that it illustrates a performance of a legendary figure in the entertainment industry. Because of Presley's immense contribution to rock 'n roll, examples of him performing can be considered of public interest. However, in comparison to a biographical film or play of Elvis Presley or a production tracing the role of Elvis Presley in the development of rock 'n roll, the information about Presley which THE BIG EL SHOW provides is of limited value.

This recognition that defendant's production has some value does not diminish our conclusion that the primary purpose of defendant's activity is to appropriate the commercial value of the likeness of Elvis Presley. Our decision receives support from two recent cases. In *Price v. Worldvision*

*Enterprises, Inc.*, 455 F.Supp. 252 (S.D.N.Y. 1978), *aff'd without opinion*, 603 F.2d 214 (2nd Cir. 1979), the court found that the protection of the right of publicity could be invoked by the widows and beneficiaries, respectively, of Oliver Hardy and Stanley Laurel to enjoin the production or distribution of a television series entitled "Stan 'n Ollie," wherein two actors would portray the comedians Laurel and Hardy. Although the facts bearing on the content of the program are not entirely clear, it appears that the show was to be based on old Laurel and Hardy routines which the comedy team performed during the careers and was not a biographical portrayal of the lives of the two men. In this regard, the court can be deemed to have decided that an inherited "right of publicity" can be invoked to protect against the unauthorized use of the name or likeness of a famous entertainer, who is deceased, in connection with an imitation, for commercial benefit, of a performance of that famous entertainer.[24]

In *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977)[25] the Supreme Court addressed a situation which implicated both a performer's right of publicity and the First Amendment.[26] The Court held that

gins at this point and must extend at least this far if the whole nature of man is not to be thwarted. [¶] Hence suppression of belief, opinion and expression is an affront to the dignity of man, a negation of man's essential nature." (Emerson [Toward A General Theory Of The First Amendment (1963)] 72 Yale L.J. at p. 879).
Quoted at *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 960, 160 Cal.Rptr. 352, 357, 603 P.2d 454, 459 (1979) (Bird, C. J., concurring).

**24.** It has been noted that the *Price* court's decisions as to prohibited imitations are "not conclusive ... since the issue was raised in the context of a res judicata discussion, and the First Amendment implications were never considered." Portrayal, *supra*, 88 Yale L.J. at 1606 n.130.

**25.** The Court cites *Ettore v. Philco Television Broadcasting Corp.*, 229 F.2d 481 (3rd Cir.),

*cert. denied*, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956) as an example of a case recognizing the right to control the commercial value in a name. 433 U.S. at 572 n.9, 97 S.Ct. at 2856 n.9. The Court quotes the following language from Ettore:

"The fact is that, if a performer performs for hire, a curtailment, without consideration, of his right to control his performance is a wrong to him. Such a wrong vitally affects his livelihood, precisely as a trade libel, for example, affects the earnings of a corporation."

*Id.* at 572 n.9, 97 S.Ct. at 2856 n.9.

**26.** For a more detailed examination of the *Zacchini* case *see* Comment, Privacy, Appropriation, and the First Amendment: A Human Cannonball's Rather Rough Landing, 579 B.Y.U.L. Rev. 579 (1977); Note, Human Cannonballs and the First Amendment: *Zacchini v. Scripps-Howard Broadcasting Co.*, 30 Stanford L.Rev., 1185 (1978).

the First Amendment did not prevent a state from deciding that a television news show's unauthorized broadcast of a film showing plaintiff's "entire act," a fifteen second human cannonball performance, infringed plaintiff's right of publicity.

In reaching its conclusion, the Court reasoned that "[t]he broadcast of [the] film of petitioner's entire act poses a substantial threat to the economic value of that performance," *id.* at 576, 97 S.Ct. at 2857–2858; that

the broadcast of petitioner's entire performance, unlike the unauthorized use of another's name for purposes of trade or the incidental use of a name or picture by the press, goes to the heart of petitioner's ability to earn a living as an entertainer. Thus, in this case, Ohio has recognized what may be the strongest case for a "right of publicity"—involving, not the appropriation of an entertainer's reputation to enhance the attractiveness of a commercial product, but the appropriation of the very activity by which the entertainer acquired his reputation in the first place.

*Id.* at 576, 97 S.Ct. at 2857–2858; and that the "protection [of the right of publicity] provides an economic incentive for the performer to produce a performance of interest to the public." *Id.*

■ In the present case, although the defendant has not shown a film of an Elvis Presley performance, he has engaged in a similar form of behavior by presenting a live performance starring an imitator of Elvis Presley. To some degree, the defendant has appropriated the "very activity [live

stage show] by which [Presley initially] acquired his reputation ..." *id.* at 576, 97 S.Ct. at 2857–2858, and from which the value in his name and likeness developed. The death of Presley diminishes the impact of certain of the court's reasons, especially the one providing for an economic incentive to produce future performances. However, through receiving royalties, the heirs of Presley are the beneficiaries of the "right of the individual to reap the reward of his endeavors." *Id.* at 573, 97 S.Ct. at 2856. Under the state's right of publicity, they are entitled to protect the commercial value of the name or likeness of Elvis Presley from activities such as defendant's which may diminish this value.

■ We thus find that the plaintiff has demonstrated a likelihood of success on the merits of its right of publicity claim with respect to the defendant's live stage production. In addition, we find this likelihood of success as to the defendant's unauthorized use of Elvis Presley's likeness on the cover or label of any records or on any pendants which are sold or distributed by the defendant.[27]

2. *Common Law Trademark or Service Mark Infringement*

■ Since the plaintiff does not assert any Federal or State of New Jersey trademark or service mark registrations, any trademark or service mark[28] infringement claims are governed by the common law, which provided the basis for and essentially parallels the protection provided by the Federal or State statutory schemes.[29] *See Dallas Cowboys Cheerleaders v. Pussy-*

27. The court also notes that the unauthorized use of the name or likeness of Elvis Presley in connection with any advertising or promotional materials for THE BIG EL SHOW production or for records or pendants would likely constitute an infringement of plaintiff's rights of publicity.

28. Service mark infringement is governed by the general principles applicable to trademark infringement. *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed. 98 (1975); *Fotomat Corp.*

*v. Photo Drive-Thru, Inc.*, 425 F.Supp. 693, 703 (D.N.J.1977).

29. "The ownership of a federal [or state] trademark registration simply supplements the rights accorded at common law which stem from the ownership of a trademark." *Time Mechanisms, Inc. v. Qonaar Corp.*, 422 F.Supp. 905, 911 (D.N.J.1976). "The Lanham Act provides for the registration and not the creation, of trademark rights; it assumes the pre-existence of a trademark. Trademark rights arise from use and not registration. [citation omitted]." *Id.*

*cat Cinema,* 604 F.2d 200, 203 n.3 (2nd Cir. 1979); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3rd Cir. 1978); *House of Westmore v. Denney,* 151 F.2d 261, 265 (3rd Cir. 1945); *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 823 (D.N.J.1980); *D. C. Comics, Inc. v. Powers,* 465 F.Supp. 843, 846 (S.D.N.Y. 1978), *aff'd on reargument,* 482 F.Supp. 494 (S.D.N.Y.1979). In order to prevail on a statutory or common law trademark or service mark infringement claim, the plaintiff must establish that the names or symbols are valid, legally protectible trademarks or service marks; that they are owned by the plaintiff; and that the defendant's subsequent use of the same or similar marks to identify goods or services is infringing, *i. e.,* is likely to create confusion as to the origin of the goods or services. *See, e. g., Scott Paper Co., supra; Perfectform Corp. v. Perfect Brassiere Co., Inc.,* 256 F.2d 736 (3rd Cir. 1958); *Caesars World, Inc., supra; Fotomat Corp., supra; Time Mechanisms, Inc., supra.* Actions for trademark [or service mark] infringement serve both to protect the "right of the public to be free of confusion and the synonymous right of a trademark [or service mark] owner to control his product's [or service's] reputation." *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir. 1976), *rev'd on retrial,* 572 F.2d 574 (7th Cir. 1978).

Plaintiff asserts that Elvis Presley, during his lifetime, created and owned valid trademarks or, more specifically, service marks for musical entertainment services in the names of ELVIS, ELVIS PRESLEY, and THE KING, the phrase ELVIS (or ELVIS PRESLEY) IN CONCERT, the logo composed of the letters TCB and lightning bolt design, and the likeness of Elvis Presley, and that these marks were all legally protectible. After Presley's death the rights in these marks were acquired by the plaintiff, which is entrusted with the preservation and management of the property and rights of the decedent, Elvis Presley, for the benefit of Presley's heirs. The

plaintiff points out that, in the fulfillment of its obligations, it has entered into a number of agreements licensing the use of the marks in various ways, including records, movies, merchandise and television performances of Presley, and that the licensees have continued to promote these trademarks and service marks. Thus, the plaintiff claims that since the service marks or trademarks are property rights and have continued to be used to identify the musical entertainment services of Presley, these marks have been inherited by and continue to exist in the plaintiff estate. Finally, the plaintiff argues that the defendant's uses of the name THE BIG EL SHOW, the logo composed of THE BIG EL SHOW name and the likeness ostensibly of Larry Seth as he appears in THE BIG EL SHOW, the term THE KING, the initials TCB with or without a lightning bolt, and all likenesses of Elvis Presley (whether or not they are really of Larry Seth as he appears or appeared in THE BIG EL SHOW) to identify his production, constitute infringements of plaintiff's marks.

Each of plaintiff's points will be evaluated in seriatim in the context of the requirements for an infringement claim.[30]

### a. *Validity of Marks*

A service mark is defined as "a word, name, symbol, device or any combination thereof adopted and used in the sale or advertising of services to identify the service of the entity and distinguish them from the services of others." *Caesars World, Inc.,* 490 F.Supp. at 822; 15 U.S.C. § 1127; N.J.S.A. 56:3–13.1(B). *See generally* 3 Callmann, "common law rights are acquired in a service mark by adopting and using the mark in connection with services rendered. [citations omitted]." *Caesars World, Inc.,* 490 F.Supp. at 822. Since the plaintiff is principally claiming, at the present time, that its marks identify Elvis

**30.** This analysis is being undertaken, assuming arguendo that the defendant has a right to

present a production like THE BIG EL SHOW.

Presley entertainment services,[31] we will focus on the validity of the names and symbols as service marks. However, it should be noted that these marks also might be trademarks[32] which identify goods, id., or particular products licensed by the marks' owner. *See Dallas Cowboys Cheerleaders v. Pussycat Cinema*, 467 F.Supp. 366, 373 (S.D.N.Y.), *affirmed*, 604 F.2d 200 (2nd Cir. 1979).

**(1). *Names***

■ The plaintiff claims that the names ELVIS, ELVIS IN CONCERT, ELVIS PRESLEY, and THE KING are valid and protectible service marks. Our review of the record indicates that the first three names have not been used only to identify a particular individual, Elvis Presley. Rather they have been used in advertising, such as for performances, concerts, and on records, to identify a service. They have appeared in close association with a clear reference (i. e., IN CONCERT OR SHOW) to entertainment services of Presley. Thus, they have attained service mark status. *See Five Platters, Inc., supra* (the name "The Platters" functions as a service mark to identify the services of a singing and entertainment group); *In re Carson, supra* (the name JOHNNY CARSON functions as a service mark to identify entertainment services rendered by John W. Carson).

With respect to the name THE KING, the plaintiff has not established this name as a valid service mark. The record reveals that Elvis Presley's nickname was The King. However, plaintiff has not presented sufficient evidence as to how the name was used to identify services, *see Hirsch v. S. C. Johnson & Son, Inc.*, 90 Wis.2d 379, 280 N.W.2d 129, 138–39 (1979), and thus to function as a service mark. Of course, the plaintiff is not precluded from establishing the term THE KING as a valid service mark by presenting appropriate evidence at trial.

**(2). *Logo***

The plaintiff has presented sufficient evidence, for the purposes of a preliminary injunction, of connection with Presley entertainment services or business, to establish the logo composed of the initials TCB with or without the lightning bolt design as a service mark. For example, the logo was used on Presley's letterhead and on business cards, *see, e. g., Re Reichold Chemicals, Inc.*, 167 U.S.P.Q. 376 (TMT & App. Bd. 1970); *Re Pierce*, 164 U.S.P.Q. 369 (TMT & App. Bd. 1970); 1 McCarthy, Trademarks and Unfair Competition, § 16:11, and it appeared on the tails of Presley's airplanes. *See generally Boston Professional Hockey Ass'n, supra; Fotomat Corp., supra.*

**(3). *Likeness and Image***

The plaintiff asserts that the likeness and image of Elvis Presley serves as a service

**31.** Entertainment is considered a service in connection with the law of service marks. See *Miss Universe, Inc. v. Patricelli*, 408 F.2d 506 (2nd Cir. 1969); *Capetola v. Orlando*, 426 F.Supp. 616, 617 (E.D.Pa.1977). *See* N.J.S.A. 56:3–13.9(b). The service in question in this case is entertainment provided by Elvis Presley. *See, e. g., Dallas Cowboys Cheerleaders v. Pussycat Cinema*, 467 F.Supp. 366, 373 (S.D.N.Y.), *affirmed*, 604 F.2d 200 (2nd Cir. 1979) (entertainment provided by the Dallas Cowboys Cheerleaders); *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372 (D.Md.1976) (singing and entertainment provided by the group The Platters); *In re Carson*, 197 U.S.P.Q. 554 (TMT & App. Bd. 1977) (entertainment services, including monologues, comedy routines and hosting guests, performed by way of personal appearances by John W. Carson). *See also Capetola*, 426 F.Supp. at 618. These entertainment services continue to exist by virtue of recordings of Presley's performances on film, videotape, audio tape, phonograph records, etc.

It should be pointed out that an Elvis Presley performance, itself, cannot be a service mark. As it has been noted, ". . . a service mark must not be the service itself, but rather a designation of its source." (*See Cebu Association of California, Inc. v. Santo Nino de Cebu USA, Inc.*, 95 Cal.App.3d 129, 137, 157 Cal.Rptr. 102.-)" *KGB, Inc. v. Giannoulas*, 104 Cal.App.3d 844, 857, 164 Cal.Rptr. 571, 583 (1980).

**32.** A trademark is defined as any work, name, symbol or device or any combination thereof adopted and used to identify the goods of one party to distinguish them from those made or sold by others. 15 U.S.C. § 1127; *see, e. g.,* N.J.S.A. 56:3–13.1(A); *Q–Tips, Inc. v. Johnson & Johnson*, 206 F.2d 144 (3rd Cir.), *cert. denied*, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953).

mark; however, the available evidence does not support such a broad position. Rather, the record only supports a conclusion that a picture or illustration of Elvis Presley dressed in one of his characteristic jumpsuits and holding a microphone in a singing pose is likely to be found to function as a service mark. This particular image (hereinafter referred to as the "Elvis Pose") has appeared in promotional and advertising material for concerts and on record albums. Thus, even though the "Elvis Pose" identifies the individual performer, we find it also has been used in the advertising and sale of Elvis Presley entertainment services to identify those services. *See generally Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema,* 467 F.Supp. 366 (S.D.N.Y.), *affirmed,* 604 F.2d 200 (2nd Cir. 1979). The court recognizes that the "Elvis Pose" has appeared in somewhat different forms; for example, the color of the outfit or the direction of the face has been altered. We do not find such changes to be determinative. Rather, we find the following idea persuasive reasoning for treating the "Elvis Pose" as a service mark:

"It is settled that a person may change the display of a mark at any time because whatever rights he may possess in the mark reside in the term itself rather than in any particular form or arrangement thereof. . . . The only requirement in these instances is that the mark be modified in such a fashion as to retain its trademark impact and symbolize a single and continuing commercial impression. That is, a change which does not alter its distinctive characteristics represents a continuity of trademark rights. Thus, where the distinctive character of the mark is not changed, the mark is, in effect, the same and the rights obtained by virtue of the earlier use of the prior form inure to the later form. [citations omitted]"

*Ilco Corporation v. Ideal Security Hardware Corporation,* 527 F.2d 1221, 1224 (C.C.P.A. 1976).

b. *Protectibility*

The requirements for a valid trademark or service mark to be considered protectible under the common law or the Lanham Act, depend on the characteristics of the marks themselves. Inherently distinctive trademarks or service marks, such as fanciful or arbitrary or non-descriptive, but suggestive, words and symbols, gain protected status upon their first adoption and use; while, non-inherently distinctive marks only achieve protection if the mark is shown to have secondary meaning. *See McCarthy, supra,* §§ 15:1, 16:2; *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 439 F.Supp. 1022, 1034 (D.Del.1977), *rev'd,* 589 F.2d 1225 (3rd Cir. 1978). A trademark or service mark attains secondary meaning if the consuming public has come to recognize the mark not only as an identification of the goods or services but as a symbol indicating that the goods or services emanate from a single source, even though the identity of that source may in fact be unknown. *Id.*

Of the five names or symbols found to be valid service marks, the three containing the personal names (surname or first name) of Elvis Presley, will be considered as non-inherently distinctive terms. The evidence sufficiently shows that these marks have been used for a long period of time through various promotions and uses, such as in advertising and on records (as well as in connection with certain licensed products), and have acquired a secondary meaning associated with Elvis Presley entertainment services as distinct from other entertainment services. *See Scott Paper Co.,* 589 F.2d at 1228; *Wyatt Earp Enterprises, Inc. v. Sackman, Inc.,* 157 F.Supp. 621 (S.D.N.Y. 1958) (name as televised by plaintiff in television show identified with merchandise upon which name licensed to appear). *Cf. Five Platters, Inc., supra* (the name, "The Platters" developed secondary meaning connected with singing and entertainment services by widespread circulation of records, public performances, and other promotional efforts).

The mark composed of the TCB and lightning bolt logo can be characterized as inherently distinctive since it is unique and arbitrary. *See Q-Tips, Inc., supra; Stan-*

*dard Brands, Inc. v. Smidler*, 151 F.2d 34 (2nd Cir. 1945); *Caesars World, Inc.*, 490 F.Supp. at 822–23. In the alternative, we also find that there is sufficient evidence of use of the mark in association with Elvis Presley entertainment services to show that the mark has acquired a secondary meaning of identifying the source of Presley entertainment services. Thus, the logo is protectible.

Finally, we find that there is sufficient evidence in the record for us to conclude that the particular "Elvis Pose" service mark, although perhaps a descriptive mark in that it illustrates the service, has acquired secondary meaning through its use in advertising and promoting of the entertainment services of Elvis Presley (as well as in identifying licensed products). *See generally Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema*, 604 F.2d 200 (2nd Cir. 1979); *Volkswagenwerk Akg. v. Rickard*, 175 U.S.P.Q. 563 (C.D.Tex.), *affirmed*, 492 F.2d 474 (5th Cir. 1972). *Volkswagenwerk Akg. v. Rose'Vear Enterprises, Inc.*, 199 U.S.P.Q. 744 (TMT & App.Bd.1978), *affirmed*, 592 F.2d 1180 (C.C.P.A.1979).

### c. *Ownership*

 Trademarks and service marks are in the nature of property rights. *See Hanover Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1915). They "can be alienated like any piece of property," McCarthy, *supra*, § 2:6; however, "unlike patents and copyrights, [they] have no existence independent of the article, service or business in connection with which the mark is used. *Id.* at § 2:7. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). We find that after Presley's death, the rights to use the service marks and trademarks identifying the entertainment services of Elvis Presley and the merchandise licensed by him passed to Presley's legal representative as a part of the assets of his estate. *See generally* Trademarks and Tradenames, 74 Am.Jur.2d 325 (1974); *Dilworth v. Hake*, 64 S.W.2d 829, 830 (Tex.Civ. App.1933) (right to use trade name descend-

ed as part of estate to executrix.) *See also Ward-Chandler Bldg. Co. v. Caldwell*, 8 Cal. App.2d 375, 47 P.2d 758 (1935). Plaintiff through the trustee and executor of the estate, is entrusted with the preservation and management of the property and rights of the decedent for the benefit of the decedent's heirs. Restatement of Trusts 2d § 174 *et seq.* (1957). Thus, as long as these marks continue to be used to identify Elvis Presley entertainment services, which are still available in such forms as records, video tapes, movies, and television performances, the marks will continue to exist and will not be considered abandoned. *See generally* McCarthy, *supra*, § 17:3; *La Societe Anonyme des Parfumes Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2nd Cir. 1974) ("The user who first appropriates the mark obtains an enforceable right to exclude others from using it as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.")

 Although the record does not provide extensive evidence of the plaintiff's use of the five service marks (or trademarks), we conclude that the evidence is sufficient, for the preliminary injunction motion, to find that plaintiff still owns and properly uses the marks. For example, the plaintiff has licensed the use of the TCB logo to identify Presley's former back up band. The fact that the band previously performed with Presley is significant since there is a connection to Presley's entertainment services. The plaintiff also continues to receive royalties from licensing agreements wherein the licensees advertise and promote the service marks or trademarks to identify Elvis Presley records, movies, merchandise and television performances. In this regard, it should be re-emphasized that the "Elvis Pose" identified earlier is the only specific image of Elvis Presley for which there is sufficient evidence in the record to qualify as a service mark or trademark.

### d. *Likelihood of Confusion*

The plaintiff claims that the defendant's uses in connection with THE BIG EL

SHOW production of: the initials TCB with and without a lightning bolt, any artist's renderings or pictures, purportedly of Larry Seth as he appears in THE BIG EL SHOW, which resemble Elvis Presley, the name THE BIG EL SHOW, the logo composed of the name THE BIG EL SHOW and the artist's rendering, and the term THE KING, constitute infringements of plaintiff's service marks.[33] Because we find that the term THE KING, unlike the other items, has not been used by the defendant as a mark to identify his entertainment service, we will not consider this term in the infringement claim.

■■■ The test for infringement of common law service marks or trademarks, which is the same as for statutorily registered marks, see *House of Westmore*, 151 F.2d at 265, is whether the defendant has made a subsequent unauthorized use of marks, which are the same or similar to those marks used by the plaintiff, in the sale or advertising of his goods or services to identify those goods or services; and the defendant's use creates a likelihood of confusion or deception as to the source of those goods or services. See *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976); *Tefal, S.A. v. Products International Co.*, 186 U.S.P.Q. 545, 548 (D.N.J.1975), *affirmed*, 529 F.2d 495 (3rd Cir. 1976); *DeCosta v. Columbia Broadcasting System, Inc.*, 520 F.2d 499, 513–15 (1st Cir.), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1975); *Perfectform Corporation*, 256 F.2d at 741; *Caesars World, Inc.*, 490 F.Supp. at 823; *Fotomat Corp.*, 425 F.Supp. at 703; *Time Mechanisms, Inc.*, 422 F.Supp. at 914; *Great Atlantic & Pacific Tea Co. v. A & P Trucking Corp.*, 29 N.J. 455, 149 A.2d 595 (1959); N.J.S.A. 56:3–13.-11. See generally 3 Callmann, supra, § 80. The facts that Elvis Presley has died and that it is undisputed that almost no one would expect to see Elvis Presley performing live in THE BIG EL SHOW does not preclude a finding of infringement. The likelihood of confusion test refers to source, and, thus, may be satisfied if the plaintiff proves that consumers viewing the defendant's marks are likely to believe that plaintiff sponsored THE BIG EL SHOW production or licensed defendant to use the marks in connection with the show or was in some other way associated or affiliated with the production. See *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema*, 604 F.2d 200, 205 (2nd Cir. 1979); *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d at 274.

■■ The determination of likelihood of confusion necessitates our weighing various factors including, but not necessarily limited to, the strength of the plaintiff's mark, the degree of similarity between the marks, the intent of the defendant in adopting the allegedly infringing mark, the similarity of products or services involved, trade channels, manners of marketing and predominant purchasers, and the evidence of actual confusion. *Q–Tips, Inc.*, 206 F.2d at 147–48; *Caesars World, Inc.*, 490 F.Supp. at 823–24; *Fotomat Corp.*, 425 F.Supp. at 703; *McNeil Laboratories, Inc. v. American Home Products Corporation*, 416 F.Supp. 804, 806 (D.N.J.1976). By applying these factors in light of our earlier findings of fact and discussions about plaintiff's marks, we have reached certain conclusions based on general comparisons applicable to all of the marks and on specific comparisons of each mark.

(1). *Strength of Plaintiff's Marks*

■■■ The strength or weakness of plaintiff's marks is an important consideration. In general, "strong marks are given . . . protection over a wide range of related

---

**33.** It should be noted that even if any of the names or terms used by the plaintiff or by the defendant qualify as trade names, *i. e.*, designations used to identify a business, vocation or occupation, see generally *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1199, 1201 (9th Cir. 1979); *Great Atlantic & Pacific Tea Co. v. A & P Trucking Corp.*, 29 N.J. 455, 149 A.2d 595 (1959): Restatement of Torts, § 716 (1938); 15 U.S.C. § 1127, rather than as service marks or trademarks, the test for infringement is generally the same. See *New West Corp.*, 595 F.2d at 1201; *Great Atlantic & Pacific, supra*. Restatement of Torts, § 717.

products [or services] and variations on appearance of the mark [, while] weak marks are given a narrow range of protection both as to products [or services] and as to visual variations." 1 McCarthy, *supra*, § 11:24. *See Family Circle, Inc. v. Family Circle Associates, Inc.*, 332 F.2d 534 (3rd Cir. 1964). "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source. [citations omitted]." *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2nd Cir. 1979). In view of our earlier discussion concerning the protectibility of plaintiff's marks, it is not necessary to conduct an extensive inquiry. For the purposes of this motion we find that plaintiff's service marks (ELVIS, ELVIS PRESLEY, ELVIS IN CONCERT, TCB with the lightning bolt and, to a lesser degree, without the lightning bolt, and the "Elvis Pose") have acquired great distinctiveness, in the eyes of the public and strongly identify Elvis Presley entertainment services and the source, although not necessarily known by name, of those services. *See generally* 1 McCarthy, *supra*, §§ 3:1–3, 11:1–24. However, we do consider the TCB logo to be somewhat weaker than the others since it has received less public exposure.

### (2). *Similarity of the Marks*

It is well-recognized that the greater the similarity between plaintiff's and defendant's marks, the greater the likelihood of confusion. See generally 2 McCarthy, supra, §§ 23:3–23:16; *Exxon Corp. v. Texas Motor Exchange of Houston*, 628 F.2d 500, 505 (5th Cir. 1980). An evaluation of similarity generally entails a comparison with respect to similarity of appearance, pronunciation, and meaning. *See Caesars World, Inc.*, 490 F.Supp. at 824; 2 McCarthy, *supra*, § 23:4; Restatement of Torts, § 729(a) (1938). In the present case, appearance is the most dominant element, and similarity of appearance is determined "on the basis of the total effect of the designation, rather than on a comparison of individual features." Restatement of Torts § 729, comment b (1938). Using these general guidelines, we reach the following conclusions.

The defendant's first mark can be considered the initials TCB. The defendant's logo of TCB with the lightning bolt, and, to a slightly lesser degree, without the lightning bolt, is essentially identical to plaintiff's corresponding mark.

The second of the defendant's marks can be characterized as any of the artist's renderings or pictures, which are purportedly of the performer Larry Seth as he appears in THE BIG EL SHOW, standing alone without being part of THE BIG EL SHOW logo. (*See, e. g.*, Exhibit P. 11). We find that such pictures are highly similar to the image of Elvis Presley portrayed in the "Elvis Pose." The use of an artist's rendering or sketch rather than a photograph does not diminish the resemblance.

The third mark, the name THE BIG EL SHOW, which is the name of defendant's production, is not as similar to one of the plaintiff's marks as the first two are. The plaintiff's marks ELVIS and ELVIS IN CONCERT provide the closest bases for comparison. Using the factors of appearance and pronunciation, we find that there is some similarity between plaintiff's marks and defendant's mark but the extent of similarity is less than for the first two marks. The resemblance results because the EL in THE BIG EL SHOW is the first two letters of Elvis, and it sounds similar, and the defendant's EL appears in the same type of blocked, capital letters as does plaintiff's ELVIS.

The fourth mark in question, and perhaps the most important, is the defendant's logo composed of the words THE BIG EL SHOW and the artist's rendering (Exhibit P. 28). Considering the total effect conveyed by this mark, we find there is a high degree of similarity with plaintiff's "Elvis Pose" and a slightly lower degree of similarity with the names ELVIS and ELVIS IN CONCERT. (*See* discussion, *supra* ). The connection in defendant's logo of the

name THE BIG EL SHOW with the picture that looks like Elvis Presley results in the letters EL being more suggestive in meaning of the marks ELVIS and ELVIS PRESLEY.

### (3). *Defendant's Intent*

■ Although the intent of the defendant in adopting a mark is only one of the factors, *see Q–Tips, Inc., supra*, if a plaintiff can demonstrate that a defendant adopted a mark with the intent of obtaining unfair commercial advantage from the reputation of the plaintiff, then "that fact alone 'may be sufficient to justify the inference that there is confusing similarity.' Restatement of Torts § 729, comment f (1938)." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980). *See John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292, 320 (E.D.Pa.1976). *See also Perfectform Corporation*, 256 F.2d at 741–42.

Because of the nature of the defendant's service, the defendant's intent as specifically related to his marks is interwoven with his intent as to the origin and presentation of the production. We have no doubt that a reason for Russen's starting his show was to capitalize on the popularity of Elvis Presley. It is also quite apparent that the show, the service in question, was designed to simulate or imitate a performance by Elvis Presley. The available evidence bearing on the defendant's reasons for adopting his marks must be considered in light of the nature of the production. It is possible that producer Russen adopted his marks in order to tell the public something about the production and to promote the show. On the other hand, such marks could have been designed mainly to deceive the public and to trade on the good will associated with plaintiff's marks.

Because the record contains a relative paucity of information bearing on defendant's intent, it is difficult to draw many strong conclusions. Based on our review, we make the following observations as to intent. Russen was well aware of Presley's TCB mark and adopted the same mark because of its connection to the Elvis Presley organization. *See Caesars World, Inc.*, 490

F.Supp. at 825 (defendant's claim of innocent adoption negated by evidence of defendant's prior awareness of plaintiff's mark). He stated that he got the idea to use TCB as the name of his band because it is the name of Elvis Presley's fan clubs and serves as Presley's motto. We find that the use of TCB in connection with defendant's production was totally unnecessary and was done only to benefit from the good will which attached to Presley and his performances and organization.

As to the name THE BIG EL SHOW and the artist's rendering or picture of the performer Larry Seth as he appears in the show, we are unable to conclude that the defendant adopted these marks *mainly* to "bask in the reflected popularity" generated by plaintiff's marks. *See Q–Tips, Inc.*, 206 F.2d at 147 (3rd Cir.), *cert. denied*, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953). The defendant indicated that the name, THE BIG EL SHOW, was thought up by Larry Seth, the star of the production, and agreed to by the defendant Russen. The defendant also indicated that the artist's rendering or pictures were all of Larry Seth as the BIG EL. The plaintiff has not offered any other evidence, beyond the marks themselves, to prove improper motive. We conclude that there is insufficient evidence that the defendant adopted the name or used the pictures predominantly for the purpose of misleading or deceiving the public rather than for suggesting the nature of THE BIG EL SHOW production.

### (4). *Similarity of Services*

As a rule, "[t]he greater the similarity between the products and services [provided by the defendant and plaintiff], the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exchange of Houston*, 628 F.2d 500, 505 (5th Cir. 1980). *See generally* Restatement of Torts § 731(e), comment d (1938). In the present case, the services of the plaintiff and of the defendant cannot be considered identical, but they are very similar. In general terms, each party's services can be described as musical entertainment provided by one singer or performer with instrumental or vocal background provided by others. There is some difference in the

forms of presentation, since plaintiff's entertainment is provided mainly in the forms of records, film, video tape, and audio tape, while defendant's entertainment mainly appears as live, stage productions.[34] The defendant, however, has also produced records, albeit in limited numbers, of THE BIG EL SHOW. In addition, both parties have engaged in forms of licensing or sub-licensing their marks to appear on such merchandise as photographs, pendants, and buttons.

■ A more specific reason for finding strong similarity is that both parties' entertainment services involve Elvis Presley. The plaintiff provides actual performances of Presley, while the defendant provides an imitation of an Elvis Presley performance. The fact that the plaintiff does not provide live stage performances of Presley, admittedly an impossibility due to Presley's current state, makes identical services virtually impossible and does lessen the similarity somewhat. In any event, direct competition or identity of services or products is not required to prove likelihood of confusion. *Great Atlantic & Pacific Tea Co., supra.*

> See *Scarves by Vera, Inc. v. Todo Imports Ltd., supra,* [544 F.2d 1167 (2d Cir. 1976)] (women's scarves and apparel with women's cosmetics and fragrances); *James Burrough Ltd. v. Sign of the Beefeater, Inc., supra* (liquor with restaurant selling liquor); *Union Carbide Corp. v. Ever-Ready, Inc., supra* [531 F.2d 366 (7th Cir. 1976)] (batteries and lamps with lightbulbs and lamps); *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.,* 350 F.Supp. 1341 (E.D.Pa.1972), aff'd *without opinion,* 480 F.2d 917 (3rd Cir. 1973) (pipe tobacco and bar accessories with scotch whiskey).

*Scott Paper Co.,* 589 F.2d at 1230.

**(5).** *Similarity of Channels of Trade, Manners of Marketing, and Predominant Purchasers*

Similarities of channels of trade, manners of marketing, and predominant purchasers of plaintiff's and defendant's services, as well as licensed goods, increase the possibilities of confusion. *See, e. g., Exxon Corp. v. Texas Motor Exchange of Houston,* 628 F.2d at 505; *DeCosta supra; Schmid Laboratories v. Youngs Drug Products,* 482 F.Supp. 14, 19–20 (D.N.J.1979); *Fotomat Corp., supra*; Restatement of Torts §§ 729(c), 731(c), (d), comment d (1938). The evidence in the record bearing on these factors is sketchy. By drawing some reasonable inferences from the available information and speculating on certain points, we have concluded that there is some similarity between the trade channels and marketing campaigns and that there is more similarity between the purchasers of the two services.

The enterprises of Presley, and more recently of plaintiff, have been national, including the New Jersey, Pennsylvania region, and international in scope and distribution. Since Presley's death, his performances as embodied in records and tapes have continued to be sold in major retail outlets. In addition, plaintiff's licensees and sublicensees have conducted marketing campaigns in order to sell a variety of merchandise. Plaintiff has also indicated that a movie about Presley has been filmed and will be released; however, the evidence does not reveal how much of the actual Presley performances will be included in the movie or when and where the movie will be exhibited. Plaintiff has not provided any other evidence that it is currently presenting any entertainment services in theaters or nightclubs. Plaintiff, however, has introduced a license agreement allowing Presley's former band to use the TCB logo on a record and in association with personal appearances.

The defendant's show has had a much smaller and more localized market. Although THE BIG EL SHOW has appeared in different American towns and cities, in-

---

**34.** However, the defendant could make a film or video tape of THE BIG EL SHOW which conceivably could be shown on television or in the movie theaters. Under these circumstances, the form of presentation of the defendant's entertainment service would be the same as the form of the plaintiff's.

cluding Las Vegas, it basically has been localized in the Northeast generally and the New Jersey-Pennsylvania region specifically. The performances usually have been presented in smaller nightclubs, although there was an engagement at a Las Vegas hotel, and the show has been advertised on a local basis.

One particularly important aspect of the defendant's advertising is the emphasis placed on the disputed marks in the records, ads, and promotional materials themselves. The picture or artist's rendering, which we have already found to have an extremely close resemblance to plaintiff's mark, is highlighted along with the name THE BIG EL SHOW, except on one of the album covers which only has a sketch of the performer. The name and the written material, such as "A TRIBUTE TO ELVIS PRESLEY," does suggest the production is a type of simulation or imitation intended to honor Presley, but does not reveal the name of the star or any information as to the producer or sponsor of the show. In essence, there is nothing to negate the reasonable impression that the artist's rendering or picture is of Elvis Presley.

The marketing of limited quantities of THE BIG EL SHOW records and merchandise also appears to be on a highly localized and small scale basis. Most of the records were given away for promotional purposes. Those records which have been sold were distributed in a few stores in the New Jersey-Pennsylvania region; while the merchandise was sold mainly at THE BIG EL SHOW performances. Interestingly, Elvis Presley merchandise was also sold at THE BIG EL SHOW performances, and the evidence shows this to be the only side-by-side sale outlet of plaintiff's and defendant's products. In addition, another similarity exists in that both parties utilized a TCB logo with a lightning bolt on their stationery.

Based on the sketchy information in the record, we conclude that there is only some similarity between the marketing campaigns and the trade channels. *See DeCosta, supra.*

The similarity between the predominant purchasers is greater than that between the marketing campaigns and trade channels. Because defendant's enterprise, THE BIG EL SHOW, is a stylized imitation of an Elvis Presley performance, it seems likely that it would appeal to many of the same members of the public who are interested in and patronize plaintiff's entertainment services. These purchasers could be called members of the Elvis Presley consuming public. Of course, there are also significant areas of difference between the "customers." For example, since the defendant's production usually has been presented in nightclubs, the customers may attend mainly for the nightclub aspect and not the production; while plaintiff's services, because of their current forms of presentation, would appeal more to home entertainment consumers (but the release of the movie could extend the appeal of plaintiff's services to members of the public who patronize nightclubs and theaters.)

*(6). Actual Confusion*

■ Plaintiff has not presented any evidence of actual confusion by members of the consuming public. Plaintiff has not shown, for example by survey evidence, that people seeing THE BIG EL SHOW or advertisements for it thought the production was associated with the plaintiff or with Elvis Presley entertainment services. Although a showing of actual confusion could be significant, such evidence is not necessary to a finding of likelihood of confusion, see, e. g., *Amstar Corp., supra; Caesars World, Inc.,* 490 F.Supp. at 825; *Fotomat Corp.,* 425 F.Supp. at 703. See generally 2 McCarthy § 23:2, particularly where the party seeks only preliminary equitable relief. See, e. g., *D. C. Comics, Inc., supra.*

*(7). Likelihood of Confusion—Conclusion*

■ In determining the existence of a likelihood of confusion, we must look through "the eyes of 'ordinary purchasers, buying with ordinary caution,' *McLean v. Fleming,* 96 U.S. 245, 251, 24 L.Ed. 828

(1878), including people whose purchasers are motivated by appearance and general impressions, *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 462 (3rd Cir. 1968), *cert. denied*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968)." *Fotomat Corp.*, 425 F.Supp. at 703. An analysis of likelihood of confusion can be a complex process because of the variety of factors to be considered and because of the subjective and conjectural nature inherent in the process. In formulating our final conclusions we have used the perspective of the "ordinary purchaser" as our guide in balancing the extent and strength of the similarities against those of the dissimilarities. Based both on our evaluations of defendant's marks in light of the multiple factors and on our general sense impressions we have reached the following conclusions. The defendant's uses of both the initials TCB with or without the lightning bolt and of any artist's rendering or picture which resembles the "Elvis Pose," alone or as part of THE BIG EL SHOW logo, as service marks or trademarks to identify the defendant's production, records, or merchandise create a likelihood of confusion as to source or sponsorship. Although our analysis of the various factors provides ample support for our conclusion, we are especially persuaded by the strength of plaintiff's marks in the entertainment industry and the virtual equivalence of these two marks of the defendant with the corresponding marks of the plaintiff.

In making our decision, it is not necessary to conclude that the public be led to believe that defendant's show is composed of actual Elvis Presley performances or is produced by the plaintiff. It is not even necessary that the public know who the plaintiff is. What is required and what we find is that the ordinary purchaser generally familiar with plaintiff's marks is likely to believe that defendant's show is somehow related to, associated with, or sponsored by the same people or entity that provides the actual Elvis Presley entertainment services identified by its own marks. It is not at all unreasonable for the public to believe that this entity, which is the plaintiff, the Estate

of Elvis Presley, has decided to license or sponsor a form of entertainment closely related to its other entertainment services. The public, realizing that an actual Elvis Presley live stage show is now impossible, might assume that the plaintiff's only alternative in order to enter this specific area of the entertainment field was to produce or sponsor an imitation of a real Elvis Presley performance, perhaps by using members of the actual Presley performing troupe or production staff or by supplying costumes or other official Presley items. It is also highly possible that consumers seeing the defendant's TCB logo or the advertisements highlighting the likeness of Elvis Presley might believe that the show is a multimedia presentation and incorporates films or recordings of actual Elvis Presley performances.

Our decisions with respect to the name THE BIG EL SHOW alone and in association with any pictures or artist's renderings resembling the "Elvis Pose" are closer. After careful consideration of the various factors, we have concluded that the use of the name THE BIG EL SHOW by itself does not create a likelihood of confusion, but its use as part of the logo or in connection with misleading pictures does create such confusion.

By attaching the artist's rendering to the name THE BIG EL SHOW to form the logo, the defendant has gone beyond allowable bounds. The likelihood of confusion associated with the artist's rendering is not sufficiently diminished by the use of the name with it. The picture, which certainly appears to be of Elvis Presley, provides the major triggering mechanism for the appeal to the public. The purchasing public seeing the picture and the name is likely to have a very similar reaction to the logo, believing the picture to be of Elvis, as it would if the picture were presented alone. The addition of the name may help to confirm that the production is an imitation of an actual Presley performance, but it really does not dispel any confusion as to plaintiff's association with or sponsorship of the production.

■ Thus, based on the current state of the record, we have found a likelihood of confusion with respect to the defendant's marks of TCB with or without the lightning bolt, any artist's renderings or pictures which resemble the "Elvis Pose," and the logo. The plaintiff has established the likelihood of its ultimate success on the merits of its infringement claims as to these marks. The plaintiff has not established the same likelihood as to the defendant's use of THE BIG EL SHOW, alone, as the name or mark for its production.

### 3. Common Law Unfair Competition

Plaintiff has alleged that the defendant's use of the names THE BIG EL SHOW, THE BIG EL SHOW IN CONCERT, THE KING, TCB (with or without the lightning bolt), the pictures resembling Elvis Presley and the presentation of the production imitating an Elvis Presley performance itself constitute common law unfair competition. Plaintiff claims that defendant's show, in combination with his advertising and promotion, should give rise to legal restraints because the defendant has "by unfair means usurped[ed] the goodwill and distinctive attributes of the business so constructed by [plaintiff]." *House of Westmore, Inc. v. Denney,* 151 F.2d 261, 265 (3rd Cir. 1945).

■ The claim of common law unfair competition, which is governed in this case by New Jersey law, covers a broader spectrum of behavior than trademark or service mark infringement. "In fact the common law of trademarks is but a part of the broader law of unfair competition." *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916). Unfair competition "may be distinguished from infringement in that it does not involve the violation of the exclusive right to use a word, mark or symbol, but rather involves any violation of a right arising from the operation of an established business." *House of Westmore v. Denney,* 151 F.2d at 265. The focus in trademark litigation is on whether an alleged symbol or name functions to identify and distinguish one's goods or services and whether

the usage by another of the same or similar mark is likely to confuse customers. Under unfair competition, the focus, generally, is on the buyer's likely confusion between two products or services based on an examination of everything that is likely to have an impact upon the purchaser. 1 McCarthy, Trademarks and Unfair Competition § 2:2 (1973). Many types of behavior are capable of constituting unfair competition. As one New Jersey court has noted:

... equity broadly concerns itself with the suppression of injurious deception and fraud whatever the means by which they are wrongfully accomplished. It must be realized that injunctive relief is not confined to the protection of those having trademarks and trade-names. It reaches beyond to encompass all cases in which it is evident that fraud and deception are practiced by one in disparaging or capturing the trade of a competitor. The ingenuity of the unfair competitor thus eludes classification but not always the restraint of a court of equity.

*American Shops, Inc. v. American Fashion Shops of Journal Square, Inc.,* 13 N.J.Super. 416, 421, 80 A.2d 575 (App.Div.1951).

■ One common form of unfair competition is closely linked to an action for trademark infringement and involves the use of the same or similar name, or symbols of a competitor or non-competitor. As in trademark infringement,

[t]he test is the likelihood of confusion or deception among actual or prospective customers of the plaintiff. Where the necessary and probable tendency of the defendant's simulation or resemblance of plaintiff's trade name is to mislead the public into believing that the defendant's business is that of or connected with plaintiff's, then neither actual confusion nor actual fraudulent intent need be shown, for the court is then concerned with the consequences of defendant's act and not the motive for them. [Citations omitted].

*Great Atlantic & Pacific Tea Co. v. A & P Trucking Co.,* 51 N.J.Super. 412, 420, 144 A.2d 172 (App.Div.1958), *modified and re-*

*manded*, 29 N.J. 455, 459, 149 A.2d 595 (1959). *See Perfectform Corporation v. Perfect Brassiere Co.*, 256 F.2d 736, 741–42 (3rd Cir. 1958); *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 828 (D.N.J. 1980); *Fotomat Corp. v. Photo Drive-Thru, Inc.*, 425 F.Supp. 693, 708–09 (D.N.J.1977). In addition, as with the trend in trademark infringement, injunctive relief will be granted "upon proof of likelihood of confusion as to source or sponsorship despite the diverse nature of the products or services involved. [citations omitted]." *Great Atlantic & Pacific Tea Co. v. A & P Trucking Corp.*, 29 N.J. at 459, 149 A.2d 595.[35]

In light of our earlier discussion, in the service mark infringement context, of the likelihood of confusion as to the names and symbols used by the defendant, it is unnecessary for an extended analysis here. It is generally acknowledged that the same facts supporting a suit for trademark or service mark infringement will support a suit for unfair competition. *See, e. g., Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 265 (5th Cir. 1980); *New West Corp. v. NYM Company of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 n.16 (7th Cir. 1976); *Time Mechanisms, Inc. v. Qonaar Corp.*, 422 F.Supp. 905, 915 (D.N.J.1976); *American Shops, Inc. v. American Fashion Shops of Journal Square, Inc.*, 13 N.J.Super. at 421, 80 A.2d 575. Thus, our earlier decisions regarding likelihood of confusion and probable success on the merits also hold for the unfair competition claims. Because there are fewer restrictions for a showing of unfair competition and more leeway in the

exercise of our equitable powers, we conclude that our findings of likelihood of confusion are even stronger. As Judge Gerry has explained, "[i]t is possible to be guilty of unfair competition even when trademark infringement is not present, if use of a similar but noninfringing mark or device is combined with unfair practices in a manner which is likely to deceive purchasers regarding the origin of goods [or services] under all the circumstances. [citations omitted]." *Fotomat Corp. v. Photo Drive-Thru, Inc.*, 425 F.Supp. at 709. Therefore, even assuming the names ELVIS, ELVIS PRESLEY, and ELVIS IN CONCERT, the TCB logo, and the "Elvis Pose" have not functioned as service marks, the current uses by the defendant of THE BIG EL SHOW logo (words and Presley likeness), the pictures resembling Presley, and the initials TCB in his advertising and business and promotional materials are still likely to deceive the public as to the origin or sponsorship of the show itself.

As to the defendant's uses of the name THE BIG EL SHOW, without any accompanying photographs or artist's renderings, and the term THE KING, we still do not find a likelihood of confusion or deception. The plaintiff has not made a sufficient showing of unfair practices or other circumstances to convince us that the defendant's proper use of these two items constitutes unfair competition.

In addition to its claims against the defendant's use of certain names or symbols in its business, advertising, or promotional materials, the plaintiff argues that the defendant's production, itself, constitutes un-

---

**35.** *See Lugosi v. Universal Pictures*, 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979), where the court explained how an individual's name or likeness associated with a theatrical presentation could become linked with unfair competition protection.

[Bela] Lugosi could have created during his lifetime through the commercial exploitation of his name, face and/or likeness in connection with the operation of any kind of business or the sale of any kind of product or service a general acceptance and good will for such business, product or service among the public, the effect of which would have

been to impress such business, product or service with a secondary meaning, protectable under the law of unfair competition. (*Johnston v. 20th Century-Fox Film Corp.* (1947) 82 Cal.App.2d 796, 810, 187 P.2d 474). The tie-up of one's name, face and/or likeness with a business, product or service creates a tangible and saleable product in much the same way as property may be created by one who organizes under his name a business to build and/or sell houses according to a fixed plan or who writes a book, paints a picture or creates an invention.

*Id.* 160 Cal.Rptr. at 326, 603 P.2d at 428.

fair competition. The plaintiff asserts that the packaging together of the image, dress, and style of Elvis Presley into an hour and one-half production designed to simulate an actual Elvis Presley production results in unfair competition since the audience viewing the performance is necessarily deceived into believing it is dealing with a service of the Estate of Elvis Presley. Plaintiff mainly relies on a type of unfair competition known as "unreasonable" or unprivileged imitation. As the Third Circuit recently noted in *S K & F, Co. v. Premo Pharmaceutical Lab.*, 625 F.2d 1055 (3rd Cir. 1980), the New Jersey cases define this tort "in roughly the same manner as did the First Restatement of Torts." *Id.* at 1062. Sections 711(c) and 741 provide the guidelines. The Restatement of Torts § 711(c) (1938) indicates that:

[one] who

(c) markets goods with an unprivileged imitation of the physical appearance of another's goods is liable to the other for the relief appropriate under [the ensuing Restatement rules with regard to calculation of damages].

The definition is set forth in § 741 of the Restatement as follows:

One who markets goods, the physical appearance of which is a copy or imitation of the physical appearance of the goods of which another is the initial distributor, markets them with an unprivileged imitation, under the rule stated in § 711, if his goods are of the same class as those of the other and are sold in a market in which the other's interest is protected, and

. . . . .

(b) the copied or imitated feature has acquired generally in the market a special significance identifying the other's goods and

(i) the copy or imitation is likely to cause prospective purchasers to regard his goods as those of the other, and

(ii) the copied or imitated feature is nonfunctional, or, if it is functional, he does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the other.

*See, e. g., French Amer. Reeds. Mfg. Co. v. Park Plastics Co.*, 20 N.J.Super. 325, 332–34, 90 A.2d 50 (App.Div.1952). *See also Squeezit Corp. v. Plastic Dispensers, Inc.*, 31 N.J.Super. 217, 106 A.2d 322 (App.Div.1952). The plaintiff specifically points to *United Cigar Stores Co. v. United Confectioners*, 92 N.J.Eq. 449, 113 A. 226 (Ch.1921) to support its position. In that case, which involved similar store fronts, the court concluded that

defendants' stores have been "dressed" in such striking simulation and imitation of the appearance of complainants' store as to deceive a very large part, if not practically all, the interested public who did not know otherwise, into thinking that defendants' stores were a part of or compartments in complainants' establishment, and, at least as to a substantial part of the public, to mislead them into patronizing defendants' stores in the mistaken belief that it was complainants' store which they were in fact patronizing as they intended to do.

*Id.* at 450, 113 A. 226.

Upon reviewing the record we find that the plaintiff has not presented sufficient evidence, such as eyewitness accounts, films, or video tapes, to show that the defendant's entire production is such a duplication of plaintiff's services that members of the public likely would be deceived into believing the production originated with the plaintiff.[36] Even assuming the defendant's production is shown to have a striking resemblance to an Elvis Presley concert, as embodied in a form such as film or video tape, this resemblance by itself, and without other evidence tending to show a deception of the public as to the origin of the

---

**36.** We find the plaintiff's offering of the promotional pictures and artist's renderings of Larry Seth as he appears in THE BIG EL SHOW and the pictures of Elvis Presley in performance to be an insufficient basis for comparing the total entertainment production provided by the defendant with the entertainment service provided by the plaintiff.

production, probably would not constitute unfair competition in the same manner as a striking resemblance to a distinctive trade or business dress would. Unlike an outside appearance of a store, the presentation of the defendant's production, itself, which occurs in a theater or club, cannot act to mislead customers into attending a performance of the defendant's show in the mistaken belief that it is associated with the plaintiff. Rather, the defendant's advertising and promotional materials for the show function to induce and attract potential customers in a manner similar to a building design or a package for a product. *See, e. g., Fotomat Corp.*, 425 F.Supp. at 709–10; *Time Mechanisms, Inc.*, 422 F.Supp. at 915. *See also Squeezit Corp.*, 31 N.J.Super. at 223–24, 106 A.2d 322.

█ In any event, even assuming the similarity in shows should be considered, we are convinced that the doctrine of unfair competition was not designed to attach strict liability to a good faith and non-confusing imitation of an entertainment service, such as a concert by a famous performer like Presley, particularly where the original performer is no longer living. As noted in *Chaplin v. Amador*, 93 Cal.App. 358, 362, 269 P. 544, 546 (1928), a case involving an unfair competition claim and an imitation of a performer:

> The case of plaintiff does not depend on his right to the exclusive use of the role, garb and mannerisms, etc.; it is based upon *fraud and deception.* The right of action in such a case arises from the *fraudulent purpose and conduct of appellant and injury caused to the plaintiff thereby, and the deception to the public.*

*Id.* at 362, 269 P. at 546. (Emphasis in original). *See also Lone Ranger v. Cox*, 124 F.2d 650 (4th Cir. 1942). *Cf. West v. Lind,*

186 Cal.App.2d 563, 9 Cal.Rptr. 288 (Cal. App.1960).

In deciding whether the defendant's activities constitute unfair competition, we must go beyond the question of whether THE BIG EL SHOW production is similar to an actual Elvis Presley performance as recorded on film, video tape, records, etc. Rather, our analysis must focus on the totality of the factors bearing on whether the defendant by his activities in the marketplace has attempted to deceive or confuse the public into believing THE BIG EL SHOW is connected with the actual Elvis Presley performances or sponsored by the same people, Elvis Presley's estate or its licensees, who have been presenting actual Elvis Presley entertainment services. *See, e. g., DeCosta v. Columbia Broadcasting System, Inc.*, 520 F.2d 499, 513–15 (1st Cir.), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1975); *Lone Ranger v. Cox, supra; Ideal Toy Corp. v. Kenner Products, Etc.*, 443 F.Supp. 291, 307–09 (S.D.N.Y. 1977); *Wyatt Earp Enterprises v. Sackman, Inc.*, 157 F.Supp. 621 (S.D.N.Y.1958). After considering these circumstances in light of our earlier findings as to likelihood of confusion, we conclude that the plaintiff has adequately demonstrated a likelihood of success on the merits as to part of its unfair competition claim. The plaintiff has made a sufficient showing of the deceptive impact of the defendant's advertising and promotional materials and other communication to the public [37] but has not made such a showing with respect to the nature or composition of the defendant's show, itself.

#### 4. *Section 43(a) of the Lanham Act*

The plaintiff argues that the defendant has violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[38] by his use of the name

---

**37.** The permissible scope of the defendant's advertising is discussed in greater detail in the section, *infra*, on § 43(a) of the Lanham Act.

**38.** Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides that:

 (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation

THE BIG EL SHOW, the initials TCB, the phrase THE BIG EL SHOW IN CONCERT, the picture or artist's rendering which looks like Elvis Presley, and the logo composed of the name and artist's rendering. The plaintiff also claims that the defendant has violated § 43(a) by his complete adoption of the performance style, accouterment and songs made famous by Presley, and by his advertising of "A Tribute to Elvis Presley."

Section 43(a) of the Lanham Act ("Act"), 15 U.S.C. § 1125(a),[39] created a "distinct federal statutory tort," *Franklin Mint, Inc. v. Franklin Mint, Ltd.,* 331 F.Supp. 827, 831 (E.D.Pa.1971), "designed to afford broad protection against various forms of unfair competition and false advertising,"[40] *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 324–25 (E.D.Pa. 1976), *aff'd in part, rev'd and remanded in part sub. nom. Donsco, Inc. v. Casper Corp.,* 587 F.2d 602 (3rd Cir. 1978), including deceptive and misleading advertising. *See Nature's Bounty, Inc. v. SuperX Drugs Corp.,* 490 F.Supp. 50, 54 (E.D.N.Y.1980). The Third Circuit recently has noted that § 43(a)

... proscribes not only acts that would technically qualify as trademark infringement, but also unfair competitive practices involving actual or potential deception. *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649, 650–51 (3d Cir. 1954); *see Ives Labs., Inc. v. Darby Drug Co.,* 601 F.2d [631] at 641–42 [(2d Cir. 1979)] (§ 43(a) creates federal statutory torts of unfair competition beyond simple trademark infringement); *Quabaug Rub-*

ber Co. v. Fabiano Shoe Co., 567 F.2d 154, 160 (1st Cir. 1977) (§ 43(a) standing to sue extends beyond trademark owner to other injured parties); *Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 236 (2d Cir. 1974) (§ 43(a) extends rights to parties injured by false advertising).

*S K & F, Co. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055, 1065 (3rd Cir. 1980).

Although § 43(a) may proscribe competitive torts not covered by trademark infringement law or common law unfair competition, *S K & F, Co.,* 625 F.2d at 1065, as a general rule, the same facts which would support an action for trademark (or service mark) infringement or common law unfair competition (facts indicating a likelihood of confusion as to source or sponsorship of goods or services) would support an action for unfair competitive practices under § 43(a). *See, e. g., New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1201 (9th Cir. 1979); *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.,* 510 F.2d 1004, 1010 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *National Lampoon, Inc. v. American Broadcasting Co., Inc.,* 376 F.Supp. 733, 746 (S.D.N.Y.), *aff'd,* 497 F.2d 1343 (2nd Cir. 1974); *Frederick Warne & Co., Inc. v. Book Sales, Inc.,* 481 F.Supp. 1191, 1195 (S.D.N.Y.1979); *John Wright, Inc.,* 419 F.Supp. at 325. *See also, S K & F, Co.,* 625 F.2d at 1065. Because we have already addressed the strength or secondary meaning and the concomitant likeli-

---

of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

**39.** *See* footnote 38. There is no dispute that the requirement of use in interstate commerce has been satisfied by the performances and advertisements of THE BIG EL SHOW in various states.

**40.** Section 43(a) of the Act does not require federal registration. *See, e. g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 203 n.3 (2nd Cir. 1979); *Boston Professional Hockey Association v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1010 (5th Cir.), *cert. denied,* 423 U.S. 991, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *Potato Chip Institute v. General Mills, Inc.,* 333 F.Supp. 173, 179 (D.Neb.1971), *aff'd per curiam,* 461 F.2d 1088 (8th Cir. 1972); *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649 (3rd Cir. 1954); *Frederick Warne & Co., Inc. v. Book Sales, Inc.,* 481 F.Supp. 1191 (S.D.N.Y.1979).

hood of confusion as to each of the names or symbols, as well as to the production itself,[41] we do not find it necessary to conduct a similar examination here. Those conclusions as to likelihood of success on the merits are sufficient to suggest that a similar result is likely for the § 43(a) claims.

As noted, one of the purposes of § 43(a), as distinguished from the common law of unfair competition, is to protect "consumers as well as commercial interests from the effects of false advertising." 2 McCarthy, Trademarks and Unfair Competition, *supra*, § 27:2 at 246. In view of the qualifications attached to our unfair competition decision,[42] we will address some comments to the permissible scope of the defendant's advertising for the stage production.[43] In this regard, we have found three lines of cases addressing unfair competition and § 43(a) claims to be especially informative. The cases are those where a violation occurs when a record is advertised so as to represent falsely the true nature or extent, if any, of the participation of a performer, *see, e. g., RCA Records v. Kory Records, Inc.*, 197 U.S.P.Q. 908 (E.D.N.Y.1978); *CBS, Inc. v. Springboard International Records*, 429 F.Supp. 563 (S.D.N.Y.1976); *CBS, Inc. v. Gusto Records, Inc.*, 403 F.Supp. 447 (M.D.Tenn.1974); *Decca Records v. Musicor Records*, 166 U.S.P.Q. 57 (S.D.N.Y.1970); *Shaw v. Time-Life Records*, 38 N.Y.2d 201, 379 N.Y.S.2d 390, 341 N.E.2d 817 (1975), where a violation occurs where deceptive title or advertising is used in connection with a movie or stage production, *see, e. g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366 (S.D.N.Y.), *aff'd*, 604 F.2d 200 (2nd Cir. 1979); *Robert Stigwood Group, Ltd. v. Sperber*, 457 F.2d 50 (2nd Cir. 1972); *Warner Bros., Inc. v. Film Ventures International*, 403 F.Supp. 522 (C.D.Cal.1975), and where a violation does not occur where a competitor

makes a copy of an unprotected product (or service) of the plaintiff's, and truthfully advertises it as a copy by using the name or trademark of the plaintiff, without his consent, to identify the originator or the product copied. *See, e. g., Saxony Products, Inc. v. Guerlain, Inc.*, 513 F.2d 716 (9th Cir. 1975), *aff'd in part, rev'd in part on different grounds*, 594 F.2d 230 (9th Cir. 1979); *Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir. 1968); *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 299 F.2d 33 (2nd Cir. 1962). These cases emphasize the significance of and techniques for preventing and alleviating deceptive and misleading advertising, while stressing the need for providing the public with truthful information about the products or services and their sources or sponsorship.

Assuming arguendo defendant's presentation of a stage show imitating an actual Elvis Presley performance were permissible, defendant would be allowed to use a name and advertising material which suggests something about the production's content. However, the success of the production or service should depend on the quality of the production, itself, and not on the ability of the defendant to deceive the public and to benefit unfairly from the goodwill attached to plaintiff's entertainment services of actual Elvis Presley performances. The defendant would have to make clear in all communications (including, but not limited to, advertising and promotional materials, theater programs or playbills, and record covers) to the consuming public that his production is not affiliated with, sponsored by, or in any other way connected with the same people who provide actual Elvis Presley entertainment services. In this respect, the defendant's current advertisements and promotional materials (*see* Exhibits P. 14,

---

**41.** *See* the sections, *supra*, addressing the Likelihood of Success on the Merits on the claims of Unfair Competition (§ III.A.3.) and Service Mark (Trademark) Infringement (§ III.A.2.).

**42.** *See* § III.A.3., *supra*, addressing the Likelihood of Success on the Merits on the claim of Unfair Competition.

**43.** The court also believes that these comments are especially appropriate at this time because of our failure to find irreparable injury from the defendant's presentation of the show under the plaintiff's right of publicity claim.

15, 19), as well as the album covers (*see* Exhibits P. 11, 13) and labels on the 45 RPM records (*see* Exhibit P. 18), are not adequate. They highlight those items, THE BIG EL SHOW logo and pictures or artist's renderings which appear to be of Elvis Presley,[44] which we already have concluded are likely to cause confusion. The use by the defendant only of phrases such as "REFLECTIONS ON A LEGEND . . . A TRIBUTE TO ELVIS PRESLEY," "Looks and Sounds like The KING," and "LIVE ON STAGE" does not diminish the confusion engendered by the use of the logo or artist's renderings to identify the production. In order to reduce this confusion, the defendant's representations and communications to the consuming public should incorporate in some manner the following ideas: that the production, or recording of the production, is a stage show, called THE BIG EL SHOW, which stars Larry Seth (or whoever is currently starring); that THE BIG EL SHOW is an attempted imitation of a performance or stage show of the late Elvis Presley; who the producer of THE BIG EL SHOW and of the record is; that neither THE BIG EL SHOW nor any recording is authorized or sponsored or licensed by the Estate of Elvis Presley; and that no one involved in the production of actual Elvis Presley performances or films or records is involved in THE BIG EL SHOW or the records of the show. In addition, in order to properly apprise potential customers that the star of THE BIG EL SHOW actually looks like Elvis Presley, the defendant should be able to use properly identified and legally obtained photographs of Elvis Presley to compare with photographs of the star of THE BIG EL SHOW.[45]

## B. *Irreparable Injury*

Having found that the plaintiff is likely to succeed on the merits as to certain claims, we must next examine the second requirement for a plaintiff seeking a preliminary injunction. The plaintiff must demonstrate that irreparable injury will result if an injunction is not granted *pendente lite.*

### 1. *Right of Publicity*

Although the plaintiff has shown a likelihood of success on the merits of its right of publicity claim, the plaintiff has not made a sufficient showing that irreparable injury will result if the defendant's production is not preliminarily enjoined. In making this decision, we note that we are treating a right of publicity claim different than a service mark infringement or unfair competition claim. Because the doctrine of the right of publicity emphasizes the protection of the commercial value of the celebrity's name or likeness, the plaintiff must demonstrate sufficiently that the defendant's use of the name and likeness of the celebrity has or is likely to result in an identifiable economic loss. In contrast, in the context of the service mark infringement, unfair competition, and § 43(a) of the Lanham Act claims, we found that irreparable injury could result even in the absence of economic harm per se.[46] One reason for this difference in approach stems from the public deception which is part of the latter three causes of action, but not part of the right of publicity claim. As a result of such public deception or confusion as to source, the plaintiff is being harmed. The plaintiff is being unfairly compelled to place the control of the good will attached to its entertainment services in the hands of the defendant.

In addition, and perhaps even more importantly, the close relationship in this case between the right of publicity and the societal considerations of free expression sup-

---

44. One of the albums portrays only an artist's rendering, without even the name, THE BIG EL SHOW, on the front of the cover. (*See* Exhibit P 11).

45. The various suggestions listed here are not meant to be all inclusive, and the defendant may offer alternatives.

46. *See* § III.B.2., *infra*, addressing Irreparable Injury and the claims of Service Mark Infringement, Common Law Unfair Competition, and § 43(a) of the Lanham Act.

ports the position that the plaintiff in seeking relief for an infringement of its rights of publicity should demonstrate an identifiable economic harm.[47] As we noted earlier,[48] the defendant's activity when viewed simply as a skilled, good faith imitation of an Elvis Presley performance, *i. e.*, without the elements leading to a likelihood of confusion, is, in some measure, consistent with the goals of freedom of expression. Thus, before the harsh step of barring defendant's activity is undertaken, the plaintiff should have to make a showing of immediate, irreparable harm to the commercial value of the right of publicity and should not be able to rely on an intangible potentiality.

In light of these comments, we find that the plaintiff has not made a sufficient showing that the presentation of this particular production, THE BIG EL SHOW, has resulted in any loss of commercial benefits to the plaintiff or will result in an irreparable commercial harm in the near future. The plaintiff has not adequately demonstrated that the existence of defendant's activity has led to or is likely to lead to a diminished ability of the plaintiff to profit from the use of Elvis Presley's name or likeness.[49] For example, there is insufficient evidence that plaintiff's (or its licensees') ability to enter into agreements licensing the use of Presley's name or likeness in connection with consumer products is seriously jeopardized by defendant's activity.[50] As a matter of fact, it is even possible that defendant's production has stimulated the public's interest in buying Elvis Presley merchandise or in seeing films or hearing records embodying actual Elvis Presley performances. *See Zacchini, supra,* 433 U.S. at 575 n.12, 97 S.Ct. at 2857 n.12 (conjecturing that the broadcast of the film showing plaintiff's act might stimulate the public interest in seeing the act live). Thus, the defendant's show will not be preliminarily enjoined.

The considerations preventing the issuance of a preliminary injunction as to the show do not sufficiently apply to the sale of pendants or records even though the sales are limited. Since the plaintiff, through its licensing programs, also engages in the sale of such items, this situation is similar to that in *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215 (2nd Cir. 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) and *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279 (S.D.N.Y.1977), where irreparable harm was found. We

**47.** *Cf. Portrayals, supra,* 1608–16, setting forth the following position as to all types of media portrayals, not just those classified as right of publicity claims:

> The second basic principle governing court decisions about media portrayals is that a portrayal must cause identifiable harm before relief will be granted. This principle is generally subordinated to the first; if a portrayal is found to serve an informative or cultural function, it will generally be immune from liability, even if it causes substantial harm. If a portrayal is simply exploitative, however, the issue of harm will be likely to control the court's decision.
>
> This principle, which is a relatively common one in tort law, is also influenced by First Amendment considerations. A clearly exploitative portrayal is not protected by the First Amendment; courts tend, however, to avoid imposing liability when there is even a possibility of such protection on the ground that First Amendment rights require "breathing space." As a result, they grant recovery in cases in which exploitation is found only if a clear showing of objectively determinable harm has been made. The types of harm that will qualify are derived from the countervailing social policies that support suits against the media—the encouragement of individual freedom, honest commercial practices, and creativity.

**48.** *See* § III.A.1.b., *supra,* addressing the Likelihood of Success on the Merits on the issue of Theatrical Imitations and The Right of Publicity.

**49.** It should also be noted that the plaintiff has not claimed that defendant's production is so false or of such a poor quality that the reputation, and the resulting commercial viability, and marketability, associated with the name and likeness of Elvis Presley has been or will be adversely affected.

**50.** In *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279 (S.D.N.Y.1977), the court based its finding of irreparable injury on the fact that unauthorized merchandise was appearing on the market and, thus, jeopardizing the licensing program authorized by Presley's estate.

find that irreparable injury would result from the continued sale and distribution of pendants displaying Elvis Presley's likeness or of records whose covers or labels display pictures or artist's renderings which are or appear to be of Elvis Presley.

### 2. Service Mark Infringement, Common Law Unfair Competition, and § 43(a) of the Lanham Act

■ As a general proposition, in the contexts of service mark (or trademark) infringement and unfair competition, including § 43(a) of the Lanham Act, the plaintiff who demonstrates a likelihood of confusion as to source, and thus, likelihood of success on the merits, will have formed a strong basis for showing irreparable injury. *See, e. g., Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 429 (S.D.N.Y.1980); *Russ Berrie & Co., Inc. v. Terry Elsner Co., Inc.*, 482 F.Supp. 980, 990 (S.D.N.Y.1980); *Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327 (E.D.Pa.1976); *United Cigar Stores Co. of America v. United Confectioners*, 92 N.J.Eq. 449, 450, 113 A. 226 (E. & A. 1921). This results because:

> A plaintiff who has demonstrated service mark infringement and unfair competition faces the probability of lost trade and appropriation of its good will. The damages in such a case are by their very nature irreparable and not susceptible of adequate measurement. *Tefal, S.A. v. Products International Co.*, 186 U.S.P.Q. 545, 548 (D.N.J.1975), *aff'd*, 529 F.2d 495, 497 (3d Cir. 1976). Plaintiff's lack of ability to control the nature and quality of services provided under an infringing service mark, even if defendant matches the high quality of plaintiff's services, constitutes irreparable injury. *Ambassador East, Inc. v. Orsatti, Inc.*, 257 F.2d 79,

82 (3d Cir. 1958); *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F.Supp. 1003 (E.D. Pa.1976).

*Fotomat Corp. v. Photo Drive-Thru, Inc.*, 425 F.Supp. 696, 711 (D.N.J.1977).[51] *See also McNeil Laboratories v. American Home Products Corp.*, 416 F.Supp. 804, 809 (D.N.J.1976); *Franklin Mint, Inc. v. Franklin Mint, Ltd.*, 331 F.Supp. 827, 830 (E.D.Pa. 1971). A similar position prevails even in connection with non-competing goods or services. As Judge Learned Hand explained in his classic statement on the subject.

> [A] merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask.

*Yale Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2nd Cir. 1928). *See James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275–76 (7th Cir. 1976); *Professional Golfers Association of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 669–70 (5th Cir. 1975); *Great Atlantic & Pacific Tea Co. v. A & P Trucking Corp.*, 29 N.J. 455, 458–60, 149 A.2d 595 (1959).

■ In the present case, the plaintiff's service marks are widely known and represent high quality entertainment services and substantial good will. The plaintiff has a significant stake in continuing to ensure

---

**51.** Irreparable injury may also occur where the infringer's goods or services are inferior to or of poorer quality than the plaintiff's. In this situation, a "plaintiff may suffer irreparable damage to its good will if the infringement causes consumers to misidentify the infringer's inferior goods as those of the plaintiff. [citations omitted]." *Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327 (E.D.Pa.1976).

Such a situation might result in the present case if a customer attends the defendant's production under the mistaken belief it is sponsored by the plaintiff and finds the production to be of poor quality. However, the plaintiff has not claimed that defendant's production is of inferior quality or reflects adversely on the reputation of Elvis Presley and his performances.

that the services or products identified by these marks maintain these standards. If the defendant were allowed to continue to use those names or symbols (THE BIG EL SHOW logo, the initials TCB with or without a lightning bolt, and pictures or artist's renderings which closely resemble Elvis Presley) previously found to engender confusion as to source, the plaintiff would be harmed seriously by the deprivation of its ability to control the nature and quality of a service which the public believes it provides. We find that "[t]his deprivation . . . constitutes irreparable injury." *Franklin Mint, Inc.*, 331 F.Supp. at 830. In addition, the plaintiff has a right to be protected from the probable damage to its good will if the purchasing public believes that the plaintiff has sponsored or helped produce THE BIG EL SHOW and is dissatisfied with the show. Such a loss of intangible value cannot be accurately measured and compensated in damages.[52]

### C. The Balance of Equities

Recognizing our earlier conclusions as to likelihood of success on the merits and irreparable injury, we find that the hardships to the defendant in complying with a preliminary injunction would not outweigh the harm to the plaintiff resulting from a failure to grant a preliminary injunction. Since the preliminary injunction would not prevent the defendant from using the name THE BIG EL SHOW or from presenting the production itself, the harm to the defendant should not be significant. This conclusion actually is supported by the defendant's own arguments as to the equities. The defendant claims only two equitable considerations: that THE BIG EL SHOW is his and his family's major source of income and that THE BIG EL SHOW has generated its own good will with the public. Although we feel the defendant has not made an adequate showing of both of these claims,[53] it is not necessary to consider this in our decision. Since our preliminary injunction would not stop the production or the use of the name THE BIG EL SHOW, the defendant's main concerns are alleviated. The defendant has not indicated that changing the advertising and promotional material and the logo or discontinuing the use of TCB will cause any real financial damage or have any other adverse impact. The effect of an injunction on defendant's sales of records also would not have any significant financial impact because of the limited number of records and extent of distribution. Finally, any loss in trade to the defendant should be due only to the fact that the defendant will no longer be using confusion to trade on the good will and reputation of the plaintiff. Any expenses incurred by the defendant in complying with the preliminary injunction could be easily calculated and adequately compensated by an award of monetary damages if the defendant ultimately prevails. *See Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327, 1340 (E.D. Pa.1976). We conclude that the relative hardship to the defendant is outweighed by the potential harm to the plaintiff if the defendant is not preliminarily enjoined from those actions likely to cause confusion.

---

**52.** As we pointed out in § III.B.1., *supra*, examining irreparable injury in the context of the right of publicity claim, the plaintiff has not presented a sufficient showing of a probability of loss of trade. Since the plaintiff is not currently sponsoring or licensing any type of stage show, or even a movie incorporating Elvis Presley performances, it does not appear that customers attending THE BIG EL SHOW are being or would be diverted from plaintiff's services. Also, there are not a sufficient number of BIG EL SHOW records on the market to constitute an irreparable injury through loss of trade. However, as we have noted, other forms of damage aside from economic harm per se can result in irreparable injury where service mark (or trademark) infringement, common law unfair competition, or violation of § 43(a) of the Lanham Act is involved.

**53.** At the hearing on the preliminary injunction, the defendant presented no evidence at all, relying mainly on his own affidavit and deposition. The failure of the defendant to utilize the hearing opportunity to provide this court with further information or testimony relevant to the balancing of hardships tends to diminish any claim that the equities favor him. *See Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 433 (S.D.N.Y. 1980).

### D. *Public Interest*[54]

The public interest requirement in cases of unfair competition or service mark (or trademark) infringement generally favors preliminary injunctions where the moving party has demonstrated a likelihood of success because "the public is . . . interested in fair competitive practices and clearly opposed to being deceived in the marketplace." *McNeil Laboratories, Inc. v. American Home Products Corporation,* 416 F.Supp. 804, 809 (D.N.J.1976). *See S K & F, Co. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055, 1067 (3rd Cir. 1980). A potential attendee at THE BIG EL SHOW or a potential buyer of a BIG EL SHOW record is entitled to know that the production has no connection with plaintiff or with the actual Elvis Presley performances. We conclude that the public interest favors our granting preliminary relief.

### IV. *Conclusion*

In accordance with the reasons set forth herein, a preliminary injunction will be entered as reflected in the attached order.

### ORDER

This matter having been brought before the court on the 29th day of October, 1980; and

The court having considered the testimony, briefs, proposed findings of fact and conclusions of law, exhibits, affidavits, depositions and oral argument; and

For the reasons stated in the court's opinion filed this day,

It is on this 16th day of April, 1980 ORDERED that the defendant Rob Russen, d/b/a THE BIG EL SHOW, his agents, servants, employees and attorneys and all persons in active concert and participation with him or acting on his behalf are restrained and enjoined, pending final determination of this action, from the following:

1. Using the initials TCB (whether in capital letters or lower case letters) alone or in combination with a lightning bolt design, in connection with any advertising, promotional materials, or business material, including letterheads and business cards, or on any covers or labels of records, or on any merchandise, or to refer to any band or orchestra, or in any manner whatsoever to refer to a concert or musical event or entertainment service not conducted or sponsored or licensed by plaintiff or under its authority;

2. Using any pictures, sketches, artist's renderings (or any other such forms) of Elvis Presley or which appear to be of or resemble the "Elvis Pose" as described or which are likely to lead persons into the mistaken belief that it is of Elvis Presley, in any advertising, promotional materials, or business materials or in any other notices or communications to identify an entertainment service or business, or on any record cover or label, or on any product, in any manner tending to deceive the purchasing public into the belief that the services or products provided by the defendant are sponsored or licensed by, or in any other way connected with the plaintiff;

3. Using any future advertisements or promotional materials, including but not limited to posters, newspaper advertisements, playbills, brochures, photograph albums, for the defendant's production of THE BIG EL SHOW which are not consistent with the general guidelines set forth in the opinion this date;

4. Using THE BIG EL SHOW logo or mark (Exhibit P 28), which is composed of the name THE BIG EL SHOW and the artist's sketch which closely resembles the "Elvis Pose," in connection with any advertising, promotional materials, or business material, including letterheads and business cards, or on any covers or labels of records, or on any merchandise, or to refer to any band or orchestra, or in any manner whatsoever to refer to a concert or musical event or entertainment service not conducted or sponsored or licensed by plaintiff or under its authority;

5. Further distribution or sale of any copies of records (33 RPMs, LPs, or 45

---

**54.** Neither the plaintiff nor the defendant has addressed this issue.

RPMs, singles), including those designated as Exhibits P 14, 15, 19, which album covers or labels display an actual picture or artist's sketch of Elvis Presley or a picture, artist's rendering, or sketch closely resembling and appearing to be of Elvis Presley; and shall neither transfer nor remove from the jurisdiction any such records;

6. Further distribution or sale of any pendants or merchandise displaying an actual picture or sketch of Elvis Presley or a picture, artist's rendering, or sketch closely resembling and appearing to be of Elvis Presley; and shall neither transfer nor remove from the jurisdiction any such pendants or merchandise;

7. Committing any other acts calculated or likely to lead persons to the mistaken belief that any event or service produced, provided, or presented by defendant emanates from plaintiff or is sponsored, approved, licensed, or supervised by plaintiff, or is in any other way connected with plaintiff; and

8. Infringing on any of plaintiff's service marks set forth in the opinion this date.

It is FURTHER ORDERED that the restraints herein contained shall become effective upon the plaintiff's giving security in the amount of Twenty-five Thousand Dollars ($25,000.00), in accordance with the provisions of Rule 65(c) of the Federal Rules of Civil Procedure, for the payment of such costs and damages as the defendant may incur or suffer if the defendant is found to have been improperly enjoined, such bond to be approved as to form and substance by the court; and

It is FURTHER ORDERED that the premium of said bond shall be an item of taxable cost.